Argued and submitted May 9, 1995, decision of Court of Appeals reversed, case
remanded to Court of Appeals September 11, 1998

Steve FOX,
Representative of the Estate of
William Daryl Fox, Deceased,
*Petitioner on Review,*

*v.*

COUNTRY MUTUAL INSURANCE CO.
and Northwest Farm Bureau Insurance Company,
*Respondents on Review.*

(CC 92CV1057, 93CV1076;
CA A81951 (Control) A83125; SC S42097)

964 P2d 997

Margaret H. Leek Leiberan, of Leiberan & Gazeley, Portland, argued the cause for petitioner on review. With her on the petition and brief was Manuel C. Hernandez, Bandon.

Bernard S. Moore, Medford, argued the cause and filed the response and brief for respondents on review.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, and Durham, Justices.**

DURHAM, J.

** Unis, J., retired June 30, 1996, and did not participate in this decision. Fadeley, J., retired January 31, 1998, and did not participate in this decision. Graber, J., resigned March 31, 1998, and did not participate in this decision. Kulongoski and Leeson, JJ., did not participate in the consideration or decision of this case.

## DURHAM, J.

These consolidated actions arise from an automobile collision that resulted in the death of William Fox (Fox). Plaintiff, who is the personal representative of Fox's estate, asserts that defendants are obligated to pay benefits to the estate under the uninsured and underinsured motorist (UM) coverage in defendants' automobile insurance policy.[1] The Court of Appeals held that defendants had no such obligation, because the collision that killed Fox was not "caused by an accident" within the meaning of defendants' policy.[2] As a consequence, the Court of Appeals affirmed the trial court's summary judgment for defendants. We reverse the decision of the Court of Appeals.

On appellate review of a summary judgment, we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the party that opposes the motion for summary judgment. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

In 1990, Vincent, a high school student, decided to wreck his pickup truck intentionally in order to collect the insurance proceeds. Fox, who was Vincent's friend and classmate, agreed to be present during the event, but the record reflects a discrepancy concerning Fox's potential involvement in Vincent's scheme. Fox told a witness shortly before the collision that he would act merely as a lookout while Vincent wrecked the truck. Vincent testified, in contrast, that Fox changed his mind before the wreck and chose to remain in the truck, and believed that his seat belt would save him from injury during the crash. The parties disagree about whether Vincent had a motive to lie, and did lie, in giving that testimony. According to plaintiff, the record supports an inference

---

[1] Our disposition of this case turns on our interpretation of ORS 742.504. ORS 742.504 applies, according to its terms, to uninsured motorist coverage. ORS 742.502(4) provides that "[u]nderinsurance coverage shall be subject to ORS 742.504 * * *." Because defendants' obligation under ORS 742.504 applies equally to uninsured and underinsured motorist coverages, we do not separately analyze plaintiff's claim for those coverages in this opinion.

[2] The decision of the Court of Appeals recites the procedural history of the consolidated actions. *Fox v. Country Mutual Ins. Co.*, 132 Or App 336, 338-41, 888 P2d 111 (1995).

that Vincent refused to stop the truck so that Fox could get out before the crash.

We do not resolve whether the foregoing factual disputes would preclude summary judgment, because it is unnecessary to do so. The evidence is uncontradicted with respect to one fact that unquestionably is material and dispositive: Vincent intended to crash the truck, but Fox did not intend to cause any injury to himself in the crash.

On the night of August 27, 1990, Vincent drove his truck off Seven Devils Road near Bandon. Fox was a passenger, not a lookout. Vincent survived, but Fox died. At the time, defendants provided automobile liability insurance to Fox's family, including Fox.

In 1992, plaintiff brought an action against Vincent for the wrongful death of Fox, and later settled the action. Plaintiff then filed these actions against defendants seeking, among other things, a declaration of defendants' liability for UM coverage for the fatal injury to Fox.

ORS 742.504 provides, in part:

"Every policy required to provide the coverage specified in ORS 742.502 shall provide uninsured motorist coverage which in each instance is no less favorable in any respect to the insured or the beneficiary than if the following provisions were set forth in the policy. However, nothing contained in this section shall require the insurer to reproduce in such policy the particular language of any of the following provisions:

"(1)(a) The insurer will pay all sums which the insured, the heirs or the legal representative of the insured shall be legally entitled to recover as general and special damages from the owner or operator of an uninsured vehicle because of bodily injury sustained by the insured *caused by accident* and arising out of the ownership, maintenance or use of such uninsured vehicle. * * *." (Emphasis added.)

That statute obligates defendants to provide UM coverage to plaintiff under the statute's terms whether or not UM coverage appears in defendants' policy.[3]

---

[3] Defendants' policy provides that the insurer

"will pay damages which an insured is legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle because of bodily injury sustained by an insured and caused by an accident."

The trial court granted a summary judgment in favor of defendants, although it did not explain its reason for that action. The Court of Appeals affirmed, reasoning that Fox's death was not caused by an accident under the policy's UM coverage. As a consequence, the Court of Appeals did not address the parties' other arguments regarding summary judgment.

The lynchpin of the Court of Appeals' opinion is its conclusion that, in applying the policy's UM provision, the central issue was whether Fox intended or expected to occupy the truck while Vincent drove it off the road, not whether Fox intended to cause a bodily injury to himself. The court stated that plaintiff's reliance on the "intended injury" test, as described in *Allstate Ins. Co. v. Stone*, 319 Or 275, 876 P2d 313 (1994),[4] was "misplaced because that test improperly views the event from Vincent's, not Fox's perspective." 132 Or App at 344. The court held that, viewing the *event* here from the perspective of Fox, the insured, the facts would compel any reasonable trier of fact to conclude that Fox intended or expected to ride off the road in the truck. *Id.* at 347. According-ing to the court, Fox expected the injury-producing *event*— the crash—even though he did not expect to cause the injury that gives rise to this coverage claim. In this court, defendants advance the analysis adopted by the Court of Appeals.

Plaintiff argues that the reasoning of the Court of Appeals contradicts the rule, discussed by this court in several cases, that a policy requirement that a personal injury be caused by an accident will preclude coverage only if the insured intended to cause both the event that produced the harm and the resulting injury or harm itself. Among other cases, plaintiff relies on *Ledford v. Gutoski*, 319 Or 397, 877 P2d 80 (1994), *Allstate*, and *Snyder v. Nelson / Leatherby Ins.*, 278 Or 409, 564 P2d 681 (1977).

---

The terms of defendants' policy deviate from the coverage description stated in ORS 742.504(1)(a), but the parties raise no issue on review concerning the legal effect of those discrepancies.

[4] In *Allstate*, this court construed an exclusion for intentionally caused injuries in a liability insurance policy, and held that an intentional injury exclusion bars coverage under such a policy only if the insured tortfeasor intended to injure the victim. 319 Or at 278-79.

■    At the outset, we note our agreement with one premise expressed by the Court of Appeals—that in analyzing this case, the court must view the event from the perspective of Fox, not Vincent. This is a first-party claim for recovery of damages for personal injury to Fox under a policy that his parents purchased from defendants. This is not a claim for coverage to protect Fox against liability claims asserted against him by a third party. *See Davis v. State Farm Mut. Ins.*, 264 Or 547, 551, 507 P2d 9 (1973), stating that

> "[t]he purpose of the [UM] coverage is not protection from liability. This portion of the policy, therefore, resembles an accident policy for the victim of the uninsured motorist."

In *Davis*, the question was whether UM coverage was applicable to an injury intentionally inflicted on the plaintiff by a third party who, by virtue of the intentionality of his act, was uninsured. The UM insurer argued that the plaintiff's injury was not subject to UM coverage because it was not caused by accident. This court rejected that view, stating:

> "Whether the occurrence is accidental depends entirely upon the point from which the question is viewed. If the occurrence is looked at from the point of view of the person who inflicts the harm or of his liability insurer, it is intentional. On the other hand, if it is looked at from the victim's standpoint, it is unforeseen, unintended, unexpected, and has every aspect of an accident as long as the occurrence was not provoked. Therefore, it is necessary to decide which point of view is the proper one from which to solve the present question.

> "The third party who inflicted the harm and his insurer are not parties to the policy upon which this action is brought. The money which will reimburse the plaintiff (if he is successful here) will not come from them. Defendant, if required to pay plaintiff, will be subrogated to any rights plaintiff has against the third party. The liability of the third party will be unaffected by the outcome of this case and no public policy will be offended because he will receive no protection from the consequences of his unlawful act. Certainly, there is no reason to consider the matter from the viewpoint of the third party and of his insurer. They are unconcerned and unaffected by the present litigation. The proper points of view are those of plaintiff and defendant.

The occurrence was accidental as far as plaintiff is concerned. Defendant points to no qualifying definition of 'accident' and any ambiguity is construed against defendant."

*Davis*, 264 Or at 550.[5] Following *Davis*, we analyze this event from the viewpoint of Fox.

■    ORS 742.504 requires defendants to include in their policy UM coverage that "in each instance is no less favorable in any respect to the insured or the beneficiary" than if the statutory coverage provision were reproduced in the policy. Because defendants must satisfy that statutory coverage obligation, the answer to the issue that the parties raise turns on the proper interpretation of ORS 742.504(1)(a). Consequently, we attempt to determine the legislature's intention in enacting that statute rather than the parties' contractual intention in entering into the insurance contract. *See Vega v. Farmers Ins. Co.*, 323 Or 291, 299-300, 918 P2d 95 (1996) (where statutory UM coverage provision controls, court resolves coverage dispute by applying methodology for statutory interpretation); *To v. State Farm Mutual Ins.*, 319 Or 93, 97, 873 P2d 1072 (1994) (where contractual and statutory provisions are equivalent, resolution of dispute over "phantom vehicle" UM coverage turns on interpretation of statute, not contract).

We discern the legislature's intention in adopting a statute by examining, first, the text and context of the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). The context includes "other provisions of the same statute and other related statutes," *id.* at 611, as well as relevant judicial constructions of those statutes. *See Owens v. Maass*, 323 Or 430, 435, 918 P2d 808 (1996) (context includes judicial constructions of earlier versions of relevant statutes). If our analysis of those sources discloses the legislature's intention, we proceed no further. *PGE*, 317 Or at 611.

---

[5] *Davis* addressed an issue that arose under Michigan law, but the court's discussion of the proper analysis of whether an injury is caused by accident, or is inflicted intentionally, under UM coverage also is a correct statement of Oregon law.

ORS 742.504(1)(a), quoted above, was enacted in 1967. Or Laws 1967, ch 482, § 3. ORS 742.500(1) specially defines the term "uninsured motorist coverage" as follows:

"As used in ORS 742.500 to 742.506:

"(1) 'Uninsured motorist coverage' means coverage within the terms and conditions specified in ORS 742.504 insuring the insured, the heirs or legal representative of the insured for all sums which the insured or they shall be legally entitled to recover as damages for bodily injury or death *caused by accident* and arising out of the ownership, maintenance or use of an uninsured motor vehicle in amounts or limits not less than the amounts or limits prescribed for bodily injury or death under ORS 806.070." (Emphasis added.)

The legislature has not altered ORS 742.504(1)(a) or ORS 742.500(1) materially since their enactment in 1967. The uninsured motorist coverage statutes contain no special definition of the phrase "caused by accident."

In the absence of a legislatively prescribed definition, we ordinarily resort to the common meaning of statutory terms in deciding whether the facts portray an injury or death caused by accident. As the court noted in *Botts v. Hartford Acc. & Indem. Co.*, 284 Or 95, 101-03, 585 P2d 657 (1978), courts face a difficult task in attempting to develop and apply one all-encompassing definition of the term "accident" to fit all factual situations:

"* * * [W]e are guided by the principle that it is the common understanding of the term which must be used and not its technical meanings. [Citations omitted.] The insurance company may, of course, insert in its policy any definition of 'accident' it chooses but, in the absence of doing so, it must accept the common understanding of the term by the ordinary member of the purchasing public. There are probably not many words which have caused courts as much trouble as 'accident' and 'accidental.' *See Kisle v. St. Paul Fire & Marine Ins.*, 262 Or 1, 5, 495 P2d 1198 (1972). They are not words which lend themselves to specific or exact meanings [citations omitted], yet, everyone thinks he knows an accident when he sees one. In our prior decisions we have endeavored, by emphasizing the foreseeability of the injury

and the intent with which it was produced, to develop definitions which best effectuate the reasonable expectations of the insured. * * *.

"* * * * *

"* * * As previously indicated, the difficulty is in the tendency to think that there is one all-encompassing definition of 'accident' which accommodates all circumstances. There is no such thing."[6]

In *St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 204-06, 923 P2d 1200 (1996), this court addressed the meaning of the term "accident" in the context of a general comprehensive liability (GCL) policy that covered third-party property damage caused by accident. The Court of Appeals had determined that coverage did not exist, reasoning that there is no "accident" if an intentional act brings an unexpected result and that the claimant had shown only that the injury-causing event—repeated soil, ground water, and surface water contamination that polluted the property of others—resulted from intentional, routine business practices.

This court reversed. First, the court quoted a dictionary definition of "accident,"[7] but concluded that the dictionary definition did not resolve the parties' dispute

---

[6] *Botts* noted that some earlier cases had focused on linguistic distinctions in policy terms that referred to "accidental cause" and "accidental injury," and had led to different and confusing results depending on whether the court categorized the policy as one covering accidental means or accidental results. The court in *Botts* concluded that it would lay the means-result distinction to rest, because the ordinary purchaser of insurance would not expect the concept of "accident" to have different meanings depending on whether the policy purported to require accidental means or accidental results. *Botts*, 284 Or at 99-100.

[7] *St. Paul Fire* states:

"The word 'accident' commonly means, as pertinent:

" '1a : an event or condition occurring by chance or arising from unknown or remote causes * * * b : lack of intention * * * 2a: a * * * sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result * * * c : an unexpected happening causing loss or injury which is not due to any fault or misconduct on the part of the person injured but from the consequences of which he may be entitled to some legal relief.' *Webster's [Third New Int'l Dictionary]* at 11 [(unabridged ed 1993)]."

324 Or at 204.

about whether "accident" referred solely to the contaminating events or solely to the injurious consequences of contamination. The court said that the dictionary definition was "broad enough to cover the proposed definitions of both sides."[8] *St. Paul Fire*, 324 Or at 204.

We reach a similar conclusion here. Our examination of the dictionary definition of the term "accident" indicates that that term incorporates the familiar requirement that a loss be fortuitous.[9] However, the definition does not make clear whether the legislature intended that term to bar coverage because the insured's intentional act caused an injurious event to occur, or because the insured intended to inflict the type of injury that resulted.

We proceed to consider the context of ORS 742.500(1) and ORS 742.504(1)(a). As noted above, the context of those statutes includes other statutes that address related subjects and relevant judicial constructions of those statutes.

---

[8] The court in *St. Paul Fire* determined that an earlier case, *Ramco, Inc. v. Pacific Ins.*, 249 Or 666, 667, 439 P2d 1002 (1968), had defined "caused by accident," for purposes of a property damage claim under a third-party GCL policy, by borrowing the definition of "accident" that this court had developed in *Finley v. Prudential Ins. Co.*, 236 Or 235, 245, 388 P2d 21 (1963) (an accident is an "incident or occurrence that happened by chance, without design and contrary to intention and expectation"). *St. Paul Fire*, 324 Or at 206. The court applied that definition by examining both *the events* that caused pollution, such as spills, ruptures and leaks, and also *the environmental harm* that resulted from those events, such as leaching of contaminants into the ground water. The court concluded that the "groundwater and soil contaminations were unintended events," *i.e.*, were caused by accident. *Id.* at 207-08.

[9] One commonly cited treatise in this field states:

"One of the fundamental principles of insurance law is that insurance contracts should only provide coverage for losses that are fortuitous. In many types of insurance policies, the importance of fortuity is manifested by coverage terms which define the risks that are transferred by using the term 'accidental' or some variation of that term. In addition, many insurance policies also include provisions that set forth in more explicit detail restrictions or limitations on the type of loss-producing circumstances that will be regarded as accidental, or clauses that specifically exclude coverage for injuries which are intentionally caused."

Alan I. Widiss, 1 *Uninsured and Underinsured Motorist Insurance* § 10.1 at 509 (2d ed 1992) (footnotes omitted).

Before enactment of the UM statutes in 1967, the legislature had enacted the Financial Responsibility Law, ORS 486.011 (1963) *et seq.*[10] In summary, those statutes required the driver and owner of a motor vehicle, upon occurrence of an automobile accident causing property damage, injury, or death, to pay a security deposit for the damages and to maintain, for five years, "proof of future responsibility." ORS 486.021(2) (1963). ORS 486.011(7) (1963) provided the following definition of "future responsibility":

> " 'Future responsibility' means the ability to respond in damages for liability, on account of *accidents* occurring subsequent to the effective date of the proof thereof *arising out of the ownership, operation, maintenance or use of a vehicle* * * *." (Emphasis added.)

The Financial Responsibility Law permitted a person to give proof of financial responsibility in several ways, including by filing a certificate of insurance that provided coverage for "damages arising out of the ownership, operation, use or maintenance" of a motor vehicle. ORS 486.411(1)(a) (1963). ORS 486.541 (1963) also provided:

> "*Every vehicle liability policy* for which a certificate of insurance is given to prove future responsibility shall state the name and address of the named insured, the coverage afforded by the policy, the premium charged therefor, the policy period, and the limits of liability, and *shall contain an agreement or indorsement which provides that the insurance is provided thereunder in accordance with the coverage defined in this chapter as respects bodily injury and death or property damage, or both, and is subject to all the provisions of this chapter.*" (Emphasis added.)

In enacting the UM statutes in 1967, the legislature incorporated several concepts and important legal terminology from the Financial Responsibility Law. Each statutory scheme authorized the issuance of a policy insuring against particular risks and required all policies to provide insurance consistent with the statutory specification of minimum coverage. Each statutory scheme required insurance policies to cover liability caused by accident arising out of the ownership, operation, maintenance, or use of a vehicle.

---

[10] The financial responsibility statutes now appear at ORS 806.010 *et seq.*

We recognize the obvious distinctions in those statutory schemes. Insurance claims arising under policies issued pursuant to the Financial Responsibility Law typically involved a third-party claim against an insured person. In contrast, an uninsured motorist claim typically involves a first-party claim by the insured person against the insurer, asserting the liability of an uninsured driver. Despite those distinctions, the important similarities in the way the two statutory schemes describe the required coverage for a particular risk, *i.e.*, liability caused by accident arising out of the use of a vehicle, justify the assumption that the legislature meant to use the term "accident" in the same sense in each statutory scheme. For purposes of legal analysis, we assume that the term "accident" in each scheme represented the same legislative policy choice. The parties offer no basis for adopting a contrary assumption. It remains to be seen what the legislature's policy choice was.

In *Snyder*, 278 Or at 414, this court was required to interpret the Financial Responsibility Law. In *Snyder*, an insurer issued a policy to defendant Nelson that covered liability caused by "accidents" pursuant to the Financial Responsibility Law. The facts indicated that Nelson had a conflict with the plaintiff, Snyder, at a bar. After leaving the bar, Nelson intentionally used his car to bump the rear of Snyder's car at high speed, causing her personal injuries and property damage. Snyder obtained a judgment against Nelson for damages and brought an action against Nelson and his insurer to garnish Nelson's insurance proceeds. The trial court granted summary judgment to Snyder, and the insurer appealed.

On appeal, the insurer made alternative arguments. First, the insurer contended that the policy afforded no coverage, because Nelson had injured Snyder intentionally. Second, the insurer argued that a factual question existed about whether Nelson intended to cause Snyder's injuries and, consequently, summary judgment was inappropriate. Nelson argued, in contrast, that the legislature had intended that policies issued pursuant to the Financial Responsibility Law should cover intentionally inflicted injuries.

The court began by rejecting the insurer's first argument that no coverage existed because Nelson's conduct was "intentional":

> "Garnishee's answer to plaintiff's allegations in the garnishment proceeding affirmatively alleges that the acts giving rise to Nelson's liability to plaintiff were his intentional rammings of plaintiff's automobile and that the policy of insurance issued to Nelson did not insure against 'intentional acts.' Garnishee's position, if interpreted literally, is, of course, not well taken. What garnishee really contends, however, as is shown by its memorandum of law filed with the trial court, is that the policy does not cover intentionally inflicted *injuries or damages*. Most, if not all, negligently inflicted injuries or damages result from intentional acts of some kind, but coverage still exists under normal policy provisions if there was no intention to cause, by the commission of the acts, the resulting injuries or damages. Although the policy provisions involved are somewhat different from those under consideration in *City of Burns v. Northwestern Mutual*, 248 Or 364, 369, 434 P2d 465 (1967), the following language from that case is appropriate here:
>
> > " '* * * The policy exclusion relates to *injury* caused intentionally. It is not sufficient that the insured's intentional, albeit wrongful, act has resulted in unintended harm; it is the harm itself that must be intended before the exclusion will apply. An act may be so certain to cause a particular kind of harm that it can be said that a person who did such an act intended the harm. * * *.' (Emphasis in original.)"

*Snyder*, 278 Or at 413 (emphasis in original).

The court next analyzed the language in the policy, which, the court noted, was provided for by the Financial Responsibility Law. *Snyder*, 278 Or at 414. Addressing the policy phrase, "caused by accident," the court said:

> "* * * Thus, the policy by its terms does not cover intentionally inflicted injuries or damages. In any event, under usual circumstances it is against public policy for a tortfeasor to insure against liability for intentionally inflicted injury or damage. *Isenhart v. General Casualty Co.*, 233 Or 49, 377 P2d 26 (1962)."

*Snyder*, 278 Or at 414.

The court next examined the statute's text, and found no support for Snyder's argument that the statute required coverage for intentionally inflicted injuries:

"* * * Plaintiff points to no particular part of the Law as indicating that a policy issued pursuant to it provides coverage for intentionally inflicted injuries and damages. The thrust of the Law apparently is to make certain that an insured has coverage of normal scope which cannot be voided subsequent to an accident by the insured's own statements or lack of cooperation. It is, therefore, our conclusion that the Financial Responsibility Law was not intended to require coverage for intentionally inflicted personal injuries or property damages."

*Id.* at 414-15.

The court was not persuaded to change its construction of the statute by two cases that the plaintiff cited. The court said that it read *Hartford Accident & Indemnity Co. v. Wolbarst*, 95 NH 40, 57 A2d 151 (1948), to require coverage, under a financial responsibility law, for the insured's intentional injurious act because:

"* * * [T]here was a finding of fact that although the insured had intended to bump the rear of the vehicle in which the parties who were injured were riding, *he had not intended thereby to inflict injuries upon them.*"

*Snyder*, 278 Or at 415 (emphasis added).

The court observed that, in *Davis*, 264 Or at 550, the court

"* * * [h]eld that there is no public policy against such coverage because the wrongdoer is not being protected thereby from the consequences of his intentional infliction of the injuries. The insured was merely insuring himself against (among other things) the possibility of being intentionally injured by an uninsured motorist."

*Snyder*, 278 Or at 415.

Finally, the court agreed with the insurer's alternative argument that the trial court erred in entering summary judgment. The court said that a jury could find that Nelson intentionally injured Snyder and damaged her vehicle, but that a jury need not necessarily draw that inference. Because

there was "a legitimate question of fact as to whether Nelson intended the injuries and damage," *id.* at 416, the court reversed the summary judgment. *Snyder* confirms that, in enacting the Financial Responsibility Law, the legislature intended that coverage for liability caused by accident would extend to the consequences of intentional conduct by the insured unless the insured, as this court explained in *Snyder*, 278 Or at 413, either intended the harm or engaged in an act so certain to cause a particular kind of harm that the court will say that the insured intended the harm.

The legislature incorporated the pivotal requirement of the Financial Responsibility Law—financial responsibility, including insurance coverage, for accidents arising out of the ownership, operation, maintenance, or use of a vehicle—when it enacted the UM statutes in 1967. *Snyder* is an authoritative interpretation by this court of the legislature's intention in enacting that requirement in the Financial Responsibility Law.

Defendants fail to acknowledge the significance of *Snyder* to our statutory analysis. First, they seek to distinguish *Snyder* factually, arguing that, in contrast to the circumstances in *Snyder*, "Fox was killed by an act which was intentional when viewed from his standpoint." That argument is incorrect because it ignores the holding in *Snyder* that statutory coverage for harm caused by "accident" exists unless the insured intentionally inflicted the *injuries* for which he demands coverage, and that the presence of intentional, and even unlawful, conduct by the insured is not sufficient to exclude coverage.

Second, defendants present no argument that would justify this court in reconsidering *Snyder*. They make no claim that, in *Snyder*, this court failed to consider the relevant statutory text, context, and legislative history, or that the court ignored legal arguments advanced in the prior case that would have led to a different outcome. *See Carlson v. Blumenstein*, 293 Or 494, 501, 651 P2d 710 (1982) (illustrating methodology for reconsidering earlier cases). Thus, defendants present no challenge to *Snyder*'s status as a controlling, and correctly decided, construction of the legislature's intention in enacting the Financial Responsibility Law.

Finally, defendants do not contend that *Snyder* construed a statutory policy that is different substantively than that embodied in the phrase "caused by accident" in ORS 742.504(1)(a). As noted above, there are minor textual differences between the Financial Responsibility Law and the UM statutes, and they address related but not identical subjects. Those differences are not pertinent here. None of the distinctions between the statutes leads to the conclusion that, by incorporating the similar terminology regarding an "accident" in each statute, the legislature nevertheless intended to adopt different definitions of that term and to produce different legal interpretations.

■   We conclude that our review of the text and context of ORS 742.500(1) and ORS 742.504(1)(a) identifies the legislature's intention in enacting those statutes. The legislature intended that the phrase "caused by accident" in ORS 742.504(1)(a) would incorporate the same standard that it had incorporated into the similarly worded Financial Responsibility Law. That standard is the one that this court identified in *Snyder*.[11] Because our review of statutory text

---

[11] This court's construction of the phrase "caused by accident" in ORS 742.504(1)(a) aligns the fortuity requirement in that statute with the same fortuity requirement that this court has discerned in insurance policy clauses covering losses caused by accident, or excluding coverage for losses caused intentionally. *See Nielsen v. St. Paul Companies*, 283 Or 277, 281, 583 P2d 545 (1978) (policy coverage for accident is not limited to negligent acts; the policy "covers intentional acts as well, so long as such acts were not done *for the purpose* of injuring another" (Emphasis in original.)); *Ledford v. Gutoski*, 319 Or 397, 401, 877 P2d 80 (1994) ("Injuries resulting from intentional acts are excluded from insurance coverage when the insured intended to cause the particular injury or harm, as opposed to merely intending the act."); *Allstate Ins. Co. v. Stone*, 319 Or 275, 278, 876 P2d 313 (1994) (same); *City of Burns v. Northwestern Mut.*, 248 Or 364, 369, 434 P2d 465 (1967) (same). This court has reached the same conclusion in applying the public policy exclusion of coverage for intentionally inflicted injury. *See A-1 Sandblasting v. Baiden*, 293 Or 17, 26, 643 P2d 1260 (1982) (although painter acted intentionally, his act was not the kind of purposeful infliction of injury that public policy places outside of insurance indemnification for intentionally inflicted injury); *Isenhart v. General Casualty Co.*, 233 Or 49, 53-54, 377 P2d 26 (1962) (same).

Our conclusion here also is consistent with the rationale of *St. Paul Fire*, although the context there—environmental pollution—was different and the intentional injury requirement was not discussed. In that case, the court determined that the harm resulting from the insured company's business practices was caused by accident because the pollution-causing spills and the consequent harm to the groundwater were unintended by the insured. *St. Paul Fire*, 324 Or 207-08. The court had no occasion in that case to discuss what rule might apply if the insured had caused the contamination intentionally.

and context makes the legislature's intention clear, the task of statutory interpretation is at an end.

We next apply the UM statutes to the facts of this case. The specific injury for which plaintiff seeks uninsured motorist coverage is a personal injury, *i.e.*, the death of Fox. Viewing the accident, as we must, from the perspective of Fox, the issue is whether the evidence demonstrates as a matter of law that, by his conduct on the night he died, Fox intended or expected to cause an injury to himself of the kind that occurred, consistent with this court's discussion of the intentional infliction of harm by an insured in *Snyder*.

■ The evidence suggests that Fox, along with Vincent, intended to cause property damage to the truck. However, there is no evidence that Fox intended to cause any harm to himself, let alone to end his life in the accident. He wore his seatbelt in the expectation that he would receive no injury. Defendants offer no facts that suggest that Fox was bent on suicide. We cannot say that Fox's act of accompanying Vincent in damaging the truck was so certain to cause an injury to Fox of the kind that occurred that Fox must have intended such a consequence.[12] To paraphrase the discussion of *Davis* in *Snyder*, there is no public policy against uninsured motorist coverage here for Fox's death, because the alleged wrongdoer, Fox, is not being protected by such coverage from the consequences of his intentional infliction of injury on himself.

The foregoing discussion identifies the only facts on which defendants rely for their contention that Fox's death was not caused by accident. After reviewing those facts in light of the legal principles discussed above, we conclude that the Court of Appeals erred in sustaining summary judgment for defendant on the theory that Fox's death was not "caused by accident" under the coverage required by ORS 742.504-(1)(a).

---

[12] As we noted in *A-1 Sandblasting*, 293 Or at 21-22, distinguishing between intentional losses and those that are only highly expectable is a difficult task. Drawing that line requires analysis of sources of law and contract terms that confirm what the insurance consumer reasonably may expect from insurance coverage for an accident, not assumptions about what rule might promote or deter tortious, or even unlawful, social behavior. We do not purport to draw that line here.

Because of its disposition, the Court of Appeals did not address plaintiff's other assignments of error and defendants' responsive arguments. For that reason, we must remand this case to the Court of Appeals for further consideration.

The decision of the Court of Appeals is reversed. The case is remanded to the Court of Appeals for further proceedings.