## ALESE C. MILLS *v.* COLONIAL PENN INSURANCE COMPANY

Superior Court      Judicial District of      File No. CV990430590S
New Haven

Memorandum filed October 17, 2000

*Dombroski, Knapsack & Hillis,* for the plaintiff.

*Nuzzo & Roberts,* for the defendant.

## I

## INTRODUCTION

BLUE, J. The motion now before the court presents the question of whether an uninsured motorists insurance policy covers the victim of a drive-by shooting. For the reasons that follow, the answer is in the affirmative.

The evidence submitted by the parties establishes that at 11:15 p.m. on September 5, 1997, the plaintiff, Alese C. Mills, was driving a 1996 Dodge Caravan in New Haven. Mills' affidavit states that while she was stopped at an overhead traffic signal on Sherman Avenue, "a maroon colored vehicle suddenly and without warning entered into the intersection in the opposite lane and discharged gunshots which struck my left forearm and abdomen, as well as my vehicle." The identity of the assailant is not known. Mills was, at the time, sixty-eight years old and has never been convicted of a crime. She did not expect the shooting and does not believe that she was the intended target.

Mills had at the time an automobile insurance policy (the policy) with the defendant, Colonial Penn Insurance Company (Colonial Penn). The policy contains uninsured motorists coverage. The uninsured motorists section of the policy provides that: "We will pay compensatory damages which an 'insured' is legally entitled to recover from the owner or operator of an 'uninsured motor vehicle' because of 'bodily injury': 1. Sustained by an 'insured', and 2. Caused by an accident. The owner or operator's liability for these damages must arise out of the ownership, maintenance or use of the 'uninsured motor vehicle.' "

There is no question that Mills is an "insured" and that she has sustained "bodily injury." The policy defines "uninsured motor vehicle" as "a land motor vehicle . . . of any type . . . [t]o which no bodily injury liability bond or policy applies at the time of the accident." The policy does not define the term "accident." The policy elsewhere employs the (also undefined) term "auto accident," but the uninsured motorists provision of the policy (quoted above) simply refers to "accident."

Mills commenced this action by service of process on September 3, 1999. Her amended complaint consists of a single count claiming benefits under the policy.

On September 14, 2000, Colonial Penn filed the motion for summary judgment now before the court. The motion claims both that Mills' injury was not "[c]aused by an accident" and that the operator's liability for her damages did not "arise out of the ownership, maintenance or use of the 'uninsured motor vehicle.' " The motion was heard on October 10, 2000. The issues of "accident" and "use" must now be considered in turn.

## II

### "ACCIDENT"

The problem at the heart of this case is easy enough to state but difficult to resolve. Whether Mills suffered an "accident" when she was shot largely depends on the perspective of the person making the assessment. If the shooter were arrested and brought before the court on a charge of assault, a claim on his part that the shooting was an "accident" would have little prospect of success. At least as far as the evidence presented here indicates, this was a cold-blooded case of attempted murder. The fact that Mills was, as it appears, either a randomly selected victim or a mistaken target would not be an extenuating circumstance.

Mills' perspective is quite different. Her selection as a victim appears to have been entirely a matter of chance. From her point of view, her injuries are every bit as accidental as they would have been had the shooter's car negligently gone through a red light and crashed into her. If, in either case, she had gone home after being released from the hospital and said, "I was injured by sheer accident" she would not be stretching the English language in doing so. How ought this problem to be resolved?

The insurance policy in question does not define the term "accident." Under these circumstances, the court must construe the word in its plain and ordinary manner

as it would be understood by the average person reading the policy. 1A J. Appleman & J. Appleman, Insurance Law & Practice (Rev. Ed. 1981) § 360, p. 448. Colonial Penn could, of course, have defined the term "accident" in any way it chose "but in the absence of doing so, it must accept the common understanding of the term by the ordinary member of the purchasing public." *Botts v. Hartford Accident & Indemnity Co.*, 284 Or. 95, 101, 585 P.2d 657 (1978).

There is one important clue in the policy, and this clue does not favor Colonial Penn. The controlling provision of the policy refers to "accident" and not (as the policy does elsewhere) "auto accident." This makes it clear that the policy's uninsured motorists coverage is not limited to conventional automobile accidents. If, to use an example mentioned in argument, a large piece of furniture had fallen from the top of the maroon vehicle and hit Mills' car, Colonial Penn concedes that an "accident" covered by the policy would have occurred in spite of the fact that the vehicles never collided. The policy does not require a collision.

An important recent decision of our Supreme Court provides an additional clue that, under Connecticut law, an intentional act may sometimes be an "accident" for purposes of an insurance policy. *Imperial Casualty & Indemnity Co. v. State*, 246 Conn. 313, 714 A.2d 1230 (1998), held that an insurance company was obliged to provide a defense to defendants in certain civil rights actions. The defendants were law enforcement officers accused of engaging in illegal wiretapping. The policy, by its terms, applied only "to damages caused by wrongful acts arising out of law enforcement activities caused by an 'occurrence.' " Id., 325. An " 'occurrence' " was defined as 'an accident.' " Id. The Imperial Casualty policy had a central ambiguity—not present in the policy here—because it specifically covered injuries, such as those caused by assault and battery, "that could have

resulted only from intentional conduct . . . ." Id., 327. The ambiguity was, in accordance with established principles, resolved in favor of the insured. Although *Imperial Casualty* is thus distinguishable from the case at hand, that case clearly stands for the proposition that, under Connecticut law, an intentional act may be an "accident" for insurance purposes.

The somewhat different problem presented here is whether an act, intentional from the shooter's point of view, may nevertheless be an "accident" from the point of view of the victim. Dictionary and judicial definitions are themselves inconclusive on this point. Thus, Webster defines "accident" as "an unforeseen unplanned event or condition." Webster's Third New International Dictionary 11 (1971). Black defines the term as "[a]n unintended and unforeseen injurious occurrence . . . ." Black's Law Dictionary (7th Ed. 1999). Our Supreme Court similarly defined the term in a much-cited workers' compensation case as "an unlooked for mishap or an untoward event or condition not expected." *Linnane* v. *Aetna Brewing Co.*, 91 Conn. 158, 162, 99 A. 507 (1916). Such definitions do not answer the question "not expected by whom?"

Because insured people have been assaulted by criminals for a very long time, there is a great deal of jurisprudence on this point. Although judicial opinion on the subject is divided, most courts have concluded that " 'accident' " should be viewed from the insured victim's perspective. *Wendell* v. *State Farm Mutual Ins. Co.*, 293 Mont. 140, 148, 974 P.2d 623 (1999) (collecting uninsured motorist authorities). Four decisions, of both ancient and modern vintage, usefully illustrate the expansive view of "accident" that courts have taken in insurance cases.

*Ripley* v. *Railway Passengers' Assurance Co.*, 20 F. Cas. 823 (C.C.W.D. Mich. 1870) (No. 11,854) (Withey,

J.), aff'd on other grounds, 83 U.S. (16 Wall.) 336, 82 S. Ct. 469, 21 L. Ed. 469 (1873), is an early much-cited case involving this point. Ripley had purchased an insurance policy providing benefits in the event of his death " 'by any accident while travelling.' " Id., 824. While he was walking between two towns in Michigan, he was beaten to death by robbers. The court held that this was an "accident," within the meaning of the policy. It reasoned that: "Perhaps, in a strict sense, any event which is brought about by design of any person is not an accident . . . . Yet I am persuaded this contract should not be interpreted so as thus to limit its meaning, for the event took place unexpectedly, and without design on Ripley's part. It was to him a casualty, and in the more popular and common acceptation of the word, 'accident' if not in its precise meaning, includes any event which takes place without the foresight or expectation of the person acted upon or affected by the event. A man goes to a livery for a horse and carriage, and is given one. But the horse is sure to run away if he is driven. This the livery man knows; the hirer does not. The horse is taken, driven, and runs away, injuring the hirer. Now, the event was foreseen and expected by the owner of the horse, but unforeseen and unexpected by the hirer, and, therefore, it seems to me it was accidental to him, and, within view of this policy, would be regarded as [an] accident. A man throws a train of cars off the track, and one or more passengers are injured or killed. To those in the car it is an accident— a casualty—while in the exact sense murder is not an accident. I think in construing a policy of insurance against accident, issued to all sorts of people, a majority of whom do not, as the company well know, nicely weigh the meaning of words and terms used in it, courts are called upon to interpret the contract as a large class not versed in lexicology are sure to regard its terms and scope. That which occurs to them unexpectedly is by them called 'accident.' " Id., 825.

*Fidelity & Casualty Co.* v. *Johnson*, 72 Miss. 333, 17 So. 2 (1895), involves an even more dramatic scenario. Johnson, who had a policy providing benefits "against 'bodily injuries sustained through external, violent, and accidental means,' " was hanged by a mob. Id., 336. The Supreme Court of Mississippi held that, for purposes of the policy, the hanging was "accidental." Id., 337. Quoting an insurance law treatise of the time, the court explained that: " 'An injury may be said objectively to be accidental, though subjectively it is not; and if it occur[s] without the agency of the insured, it may logically be termed accidental, though it was brought about designedly by another person.' " Id.

A pair of extremely recent decisions shows that the analysis of *Ripley* and *Johnson* has withstood the test of time. *Fox* v. *Country Mutual Ins. Co.*, 327 Or. 500, 964 P.2d 997 (1998), involved a passenger who died in the intentional wreck of a driver's vehicle. Vincent, the driver, decided to wreck his pickup truck intentionally in order to collect the insurance proceeds. He refused to stop the truck before Fox, a passenger, could escape, and Fox was killed in the resulting crash. The Supreme Court of Oregon held that Fox's death had been " 'caused by an accident' " for purposes of the uninsured motorists insurance policy sought to be construed. Id., 516. It reasoned that: "The insured was merely insuring himself against (among other things) the possibility of being intentionally injured by an uninsured motorist." (Internal quotation marks omitted.) Id., 513.

*Abraham* v. *Raso*, 183 F.3d 279 (3d Cir. 1999), involved a police officer struck by an automobile driven by an escaping thief. Construing New Jersey law, the United States Court of Appeals for the Third Circuit held that the incident was an "accident" for purposes of the officer's uninsured motorist policy and that "Uninsured Motorist Coverage must be afforded to victims of intentional automobile collisions." (Internal

quotation marks omitted.) Id., 299. *Abraham*'s reasoning on the underlying policy considerations is especially luminous: "Courts adopting the victim's perspective for uninsured motorist coverage have done so in part because they recognized that a major rationale for using the tortfeasor's perspective vanishes once you move from liability coverage to uninsured motorist coverage. Liability coverage protects the insured from the costs of his or her own acts, so for obvious reasons, the coverage typically does not extend to the insured's intentional wrongdoing. . . . Thus, the rule evolved in the context of liability coverage that since the insured and the tortfeasor are one and the same person, the insured tortfeasor's perspective should be used for deciding when there is an accident triggering coverage. Uninsured motorist coverage, however, is different. Unlike liability coverage, it protects an insured from harm caused by other people's acts, and an insured is equally blameless and surprised regardless of whether the tortfeasor acted negligently or intentionally. Covering the insured under these circumstances does not encourage the insured to commit intentional, wrongful acts and protects the insured from unexpected losses.

"One natural response is that uninsured motorist coverage is intended to replace the coverage a tort victim would have if the tortfeasor actually had liability insurance. Since the tortfeasor's liability insurance would not pay for the tortfeasor's intentional acts, the argument continues, people are no worse off when they are denied uninsured motorist coverage for the intentional acts of others. The difficulty with this argument is that it begs the question. When the tortfeasor's auto insurance denies coverage because the insured's acts were intentional, then the tort victim is faced with an uninsured motorist. . . . [T]he insured motorist policy was bought to cover unforeseen accidents caused by others who have no insurance coverage . . . ." (Citation omitted.) Id., 297–98.

*Abraham*'s reasoning is persuasive here. Mills bought her policy to cover unforeseen accidents caused by others who have no insurance coverage. The shots fired from the maroon vehicle were an unforeseen accident of this description. Mills could not have foreseen the shooting. From her perspective, which is the perspective that controls, the shooting was as fortuitous as any auto accident. Although the tortfeasor himself would be denied insurance coverage for policy reasons, this fact simply means that the maroon car was an "uninsured motor vehicle" within the meaning of the policy. Affording Mills coverage will not encourage her—as liability coverage would encourage the tortfeasor—to commit future crimes. It will, instead, provide her with an appropriate benefit under her policy. Under the circumstances of this case, the shooting was an "accident" for purposes of the policy.

## III

## "USE"

The next question that must be addressed is whether the operator's liability for Mills' damages "ar[o]se out of the ownership, maintenance or use of the 'uninsured motor vehicle' " for purposes of the policy in question. The relevant inquiry here centers upon the use of the shooter's vehicle, rather than its ownership or maintenance.

Like the question of "accident" already discussed, the issue of whether a drive-by shooting arises out of the "use" of a motor vehicle is one that has divided the courts of this country. See *Wendell* v. *State Farm Mutual Ins. Co.*, supra, 293 Mont. 158–65 (collecting authorities). No Connecticut reviewing court has addressed the issue. A recent Superior Court decision has concluded that a shooting under circumstances similar to that of the present case does not arise out of the "use" of a motor vehicle. *Espinosa* v. *Atlantic Casualty*

*Co.,* 46 Conn. Sup. 614, 763 A.2d 691 (2000). *Espinosa,* however, is in significant tension with well reasoned Supreme Court authority on the proper interpretation of the phrase "use" of a motor vehicle, and that authority emphatically states that the phrase is to be broadly construed.

The most significant Connecticut authority on this point is *Hogle* v. *Hogle,* 167 Conn. 572, 356 A.2d 172 (1975). The plaintiff, Dorothy Hogle, had been a passenger in an automobile driven by her husband. The car had crashed into a tree. Mr. Hogle, having been sued by his wife, moved to cite in his homeowner's insurance company, The Aetna Casualty and Surety Company. The insurance policy in question had a clause excluding liability arising out of the "use" of an automobile. Mr. Hogle, as stated, had indeed been driving his automobile, but he claimed "that the accident had been caused by his collie dog, not by any negligence on his part, in that the dog had jumped from the rear seat of the car to the left front window, striking Mr. Hogle while he was driving . . . ." Id., 574. The Supreme Court held that, even if this allegation were true, the accident nevertheless arose out of the "use" of an automobile. Its reasoning was very broad: "[I]t is generally understood that for liability for an accident or an injury to be said to 'arise out of' the 'use' of an automobile for the purpose of determining coverage under the appropriate provisions of a liability insurance policy, it is sufficient to show only that the accident or injury 'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' the use of the automobile, in order to meet the requirement that there be a causal relationship between the accident or injury and the use of the automobile. . . . Aetna's obligation to pay the judgment rendered in favor of Mrs. Hogle does not depend on whether it was Mr. Hogle's negligent operation of the car, or the activities of his dog inside the car, which

constituted the 'proximate cause' of the accident, and, consequently, of Mrs. Hogle's injuries, as Mr. Hogle contends. Such obligation, rather, depends in this case on another fact, namely, whether Mr. Hogle's 'use' of his car was connected with the accident or the creation of a condition that caused the accident. . . . Our review of the pleadings, affidavits, and other proofs submitted discloses no genuine issue between Mr. Hogle and Aetna on the fact that his use of the automobile was *in some way* 'connected with' the accident which resulted in the injuries complained of by Mrs. Hogle." (Citations omitted; emphasis added.) Id., 577–78; see also *Aetna Life & Casualty Co.* v. *Bulaong*, 218 Conn. 51, 62, 588 A.2d 138 (1991).

In opposing Mills' argument here, Colonial Penn relies on *Hughes* v. *National Car Rental Systems, Inc.*, 22 Conn. App. 586, 577 A.2d 1132, cert. denied, 216 Conn. 817, 580 A.2d 57 (1990). *Hughes* does not involve the construction of an insurance policy. Rather, that case involves the construction of General Statutes § 14-154a, which provides that: "Any person renting or leasing to another any motor vehicle owned by him shall be liable for any damage to any person or property *caused by the operation of such motor vehicle* while so rented or leased, to the same extent as the operator would have been liable if he had also been the owner." (Emphasis added.) Hughes, like Mills, had been injured by a drive-by shooter. Unlike Mills, Hughes was able to identify the owner of his assailant's vehicle, which turned out to be National Car Rental Systems, Inc. The Appellate Court held that Hughes had no cause of action under § 14-154a. The court's analysis centered on "general common law principles of proximate causation." *Hughes* v. *National Car Rental Systems, Inc.*, supra, 589. The court explained that: "Although the plaintiff argues vigorously on appeal that the distance that was maintained between the rental car and the plaintiff's

car was necessary to produce the injury, we cannot view the *operation* as anything more than a means of access to the plaintiff's car and a means of escape. Although there is no question that the vehicle was in operation within the meaning of § 14-154a at the time of the shooting, the allegations do not support the conclusion that the operation of the motor vehicle was the proximate cause of the plaintiff's injuries." (Emphasis in original.) Id., 590–91.

The analysis of *Hughes* is quite different from that of *Hogle*. *Hughes* looks to "general common law principles of proximate causation." *Hughes* v. *National Car Rental Systems, Inc.*, supra, 22 Conn. App. 589. *Hogle*, in contrast, specifically explains that the "proximate cause" of the accident in question is not the touchstone. The question, instead, is whether the operator's "use of the automobile was in some way 'connected with' the accident which resulted in the injuries complained of . . . ." *Hogle* v. *Hogle*, supra, 167 Conn. 578. The difference in analysis can be explained both by the texts interpreted by the two decisions and by the differing purposes of those texts. *Hughes* construes the term "caused" located in a statutory provision imposing "a vicarious liability unknown at common law." *Hughes* v. *National Car Rental Systems, Inc.*, supra, 588. *Hogle* construes an insurance policy not using the word "caused" at all. As a purely textual matter, it was unproblematic for *Hughes* to conclude that when the legislature used the word "caused" it referred to the well known common law concept of "proximate cause." *Hogle* was not confronted with a document containing the term "caused" in the first place and thus could appropriately go beyond the formal requirements of proximate cause in its analysis.

Because the present case involves the construction of an insurance policy predicating coverage on "use" of a motor vehicle, this court's analysis is appropriately

guided by *Hogle* rather than by *Hughes*. As discussed above, *Hogle*'s analysis is very broad. The question is whether the assailant's use of the maroon vehicle "was in some way 'connected with' the accident . . . ." *Hogle* v. *Hogle*, supra, 167 Conn. 578. The answer to this question is plainly in the affirmative. As the Supreme Court of New Jersey explained in a factually similar case: "[T]he automobile did more than provide a setting or an enhanced opportunity for the assault. In addition to allowing the assailant to be at the place of attack, it furnished the assailant with what he must have assumed would be both anonymity and a means of escape. The assailant would not likely have committed such an act of apparently random violence without the use of a car." *Lindstrom* v. *Hanover Ins. Co.*, 138 N.J. 242, 252, 649 A.2d 1272 (1994).

The fact that the terminology in question is that of an insurance policy provides an additional reason for an expansive, rather than restrictive, interpretation of the phrase " 'arise out of' the 'use' " of a motor vehicle. *Hogle* v. *Hogle*, supra, 167 Conn. 577. The Supreme Court of Rhode Island has explained that "the clause 'arising out of the use of the motor vehicle' is framed in general, comprehensive terms in order to express the intent to effect broad coverage. Such terms should be construed liberally because their function is to extend coverage broadly." *General Accident Ins. Co. of America* v. *Olivier*, 574 A.2d 1240, 1242 (R.I. 1990). The scenario in the present case—gunshots fired from a passing automobile—is an urban motorist's nightmare. Injuries resulting from such violent encounters might reasonably be said to be in the contemplation of Connecticut consumers when they purchase auto insurance. See *Blish* v. *Atlanta Casualty Co.*, 736 So. 2d 1151, 1155 (Fla. 1999). Because this is an insurance case—and because "use," like "accident," is not defined in the policy—it is the understanding of the ordinary

purchaser that controls. Under these circumstances, the assailant's liability for Mills' damages arose out of the use of the assailant's motor vehicle.

## IV

## CONCLUSION

The motion for summary judgment is denied.