Argued and submitted October 6, 1994, affirmed January 4, petition for review
denied April 18, 1995 (321 Or 47)

Steve FOX,
Representative of the Estate of
William Daryl Fox, Deceased,
*Appellant,*

*v.*

COUNTRY MUTUAL INSURANCE CO.
and Northwest Farm Bureau Insurance Co.,
*Respondents.*

(92CV1057, 93CV1076; CA A81951 (Control), A83125)
(Cases Consolidated)

888 P2d 111

Manuel C. Hernandez argued the cause for appellant. With him on the briefs were Elizabth N. McCorkle and Manuel C. Hernandez & Associates, P.C.

Thomas F. Armosino argued the cause for respondents. With him on the brief was Bernard S. Moore.

Before Deits, Presiding Judge, and Riggs and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Plaintiff appeals from judgments for defendants Country Mutual Insurance Co. and Northwest Farm Bureau Insurance Co. in related actions concerning plaintiff's uninsured motorist (UM) insurance coverage. In the first action, the trial court entered summary judgment for defendants on plaintiff's claims for a declaration of coverage under the UM policy and dismissed plaintiff's claims for breach of contract and tortious interference with economic relations for failure to state a claim. ORCP 21A(8). In the second, subsequent action, the court dismissed plaintiff's claim that defendants fraudulently misrepresented the UM policy limit. We affirm.

Plaintiff is the father and personal representative of the estate of William Fox (Fox).[1] This litigation arises from Fox's death during a staged auto accident in Coos County in August 1990.

During the summer of 1990, Tim Vincent, one of Fox's close friends and a high school classmate, decided to intentionally wreck his Nissan pickup so that he could collect the insurance proceeds and purchase a Toyota pickup. Fox and Vincent discussed Vincent's plans, and Fox agreed to participate, initially, as a look-out for oncoming traffic. On the night of August 27, 1990, Vincent, with Fox as a passenger, not a look-out, intentionally drove his Nissan off Seven Devils Road near Bandon. Vincent survived the wreck, but Fox did not.

At the time of the wreck, Vincent was a named insured under a $500,000 automobile liability policy from North Pacific Insurance Co. Fox was a named insured under his family's UM coverage, which defendants issued with a limit of $500,000.

For more than a year following the wreck, Vincent falsely maintained that he accidentally drove off the road because he was blinded by the headlights of a "phantom"

---

[1] As amplified below, most of our analysis pertains to the summary judgment against plaintiff's breach of contract claim. For those purposes, the record is viewed in the light most favorable to the plaintiff, the party opposing summary judgment, even with respect to those issues upon which the opposing party would have the burden at trial. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978).

oncoming car as he came around a sharp curve. However, in December 1991, Vincent finally confessed to intentionally causing the wreck to collect insurance proceeds and subsequently pleaded no contest to criminally negligent homicide.

In January 1992, plaintiff sued Vincent for wrongful death. Because plaintiff feared that Vincent's insurer, North Pacific, might deny coverage, based on Vincent's intentional and fraudulent conduct, he contacted defendants' agent, Jack Waters, to ask about his family's UM coverage at the time of the wreck. Waters erroneously told plaintiff that the policy limit was $100,000, not $500,000.

In April 1992, North Pacific filed an action against Vincent, seeking a declaration that it had no duty to defend or indemnify him because of his intentional and fraudulent conduct. Despite the pendency of that action, North Pacific and plaintiff began negotiating a settlement of the wrongful death action. In June 1992, plaintiff wrote to defendants, giving them notice of North Pacific's declaratory judgment action, advising them of a potential settlement with North Pacific, and demanding arbitration to determine coverage under the UM policy. Defendants did not reply. Thereafter, and without receiving defendants' consent,[2] plaintiff accepted $150,000 from North Pacific in settlement of the wrongful death action against Vincent. In July 1992, North Pacific dismissed without prejudice its declaratory judgment action.

In August 1992, plaintiff brought a product liability suit against Nissan, alleging that the truck had a defective seat belt system. Nissan, in turn, impleaded Vincent causing North Pacific to revive its declaratory judgment action. On August 13, 1993, the court entered a judgment declaring Vincent's liability policy void because of his intentional and fraudulent conduct. *North Pacific Ins. Co. v. Vincent and Nissan Corp.*, Coos County Circuit Court Case No. 92CV-1026. That judgment was never appealed.

---

[2] Plaintiff's policy provides:

"We do not provide coverage * * * for bodily injury sustained by anyone * * * if, without our consent, the bodily injury or death claim is settled or is resolved by a judgment in a court of law."

In November 1992, while North Pacific's revived action was pending, defendants informed plaintiff that the UM policy limit at the time of Fox's death was $500,000, not $100,000. Plaintiff then sued defendants, seeking a declaration of coverage under the UM policy and asserting further claims of breach of contract for nonpayment of UM benefits, and tortious interference with plaintiff's settlement with North Pacific.[3] The trial court dismissed the breach of contract and tortious interference claims under ORCP 21A(8) and entered summary judgment against plaintiff on the declaratory judgment claim. Plaintiff then moved to set the judgment aside so that he could amend his complaint to allege fraud. When the court denied that motion, plaintiff filed a second action against defendants alleging fraud. The court dismissed that action as barred by *res judicata*. Plaintiff appeals the judgments in both actions, which are consolidated for our review.

Plaintiff first assigns error to the entry of summary judgment against his claim for declaratory relief. In moving for summary judgment, defendants argued that the UM policy did not cover claims arising from Fox's death for three separate, alternative reasons. First, Fox's death was not "caused by an accident." Second, the Vincent vehicle was neither uninsured nor underinsured. Third, even if Fox's death were otherwise covered, plaintiff's settlement without defendants' consent barred recovery under the UM policy. The trial court's judgment did not specify its grounds for granting summary judgment.[4] Because we affirm on defendants' first ground, we do not reach the others.

Plaintiff's uninsured motorist policy provides:

"If you have paid for this coverage * * *, we will pay damages which an insured is legally entitled to recover from an owner or operator of an uninsured or underinsured motor vehicle

---

[3] The gravamen of plaintiff's tortious interference claim was that, by misrepresenting the amount of the UM coverage, defendants caused plaintiff to settle for an amount less than plaintiff would have, had plaintiff known the true limits of his own UM coverage.

[4] The parties did not designate a transcript of the court's oral ruling, which might indicate a basis for the trial court's decision, as part of the record on appeal.

because of bodily injury sustained by an insured and *caused by an accident*." (Emphasis supplied.)[5]

Neither the policy nor the uninsured motorist insurance statutes, ORS 742.500 *et seq,* define when an injury is "caused by accident."

Defendants argue that they are entitled to prevail on either of two grounds: (1) Plaintiffs are precluded[6] from asserting that Fox's death was caused by an accident, because of the court's prior determination in *North Pacific Ins. Co. v. Vincent and Nissan Corp., supra,* that Vincent intentionally caused the wreck. (2) In any event, Fox's death did not result from an accident because uncontroverted evidence establishes that Fox intended to participate in the event, rendering the Seven Devils Road wreck non-accidental with respect to, Fox. We conclude that the *North Pacific* judgment was not preclusive in this context, because the determination of whether the wreck was "accidental" for purposes of Vincent's liability coverage turned on a qualitatively different analysis than that required here. Summary judgment was, nonetheless, proper because Fox's voluntary participation in the wreck as established by uncontroverted evidence rendered the wreck non-accidental for purposes of UM coverage.

■ We turn first to issue preclusion. In *Davis v. State Farm Mut. Ins.,* 264 Or 547, 507 P2d 9 (1973), the Oregon Supreme Court, applying Michigan law, held that for the purposes of uninsured motorist insurance, a court must determine whether an incident constitutes an "accident" from the perspective of the insured (*i.e.,* injured) party. There, the tortfeasor intentionally injured the plaintiff by hitting him with his car, and the tortfeasor's liability insurer subsequently denied coverage for its insured's intentional conduct. When the plaintiff attempted to collect under his

---

[5] The policy language tracks that of ORS 742.504(1)(a):

"The insurer will pay all sums which the insured, the heirs or the legal representative of the insured shall be legally entitled to recover as general and special damages from the owner or operator of an uninsured vehicle because of bodily injury sustained by the insured caused by accident and arising out of the ownership, maintenance or use of such uninsured vehicle."

[6] Although defendants refer colloquially to "collateral estoppel," the doctrine they attempt to invoke is now properly denominated "issue preclusion." *See Drews v. EBI Companies,* 310 Or 134, 139, 795 P2d 531 (1990).

own uninsured motorist policy, the UM insurer denied coverage on the ground that the plaintiff's injuries were not "caused by accident." The trial court held that the plaintiff was entitled to recover under the UM policy, and the Supreme Court affirmed:

> "Whether the occurrence is accidental depends entirely upon the point from which the question is viewed. If the occurrence is looked at from the point of view of the person who inflicts the harm or of his liability insurer, it is intentional. On the other hand, if it is looked at from the victim's standpoint, it is unforeseen, unintended, unexpected, and has every aspect of an accident as long as the occurrence was not provoked. Therefore, it is necessary to decide which point of view is the proper one from which to solve the present question.

> "The third party who inflicted the harm and his insurer are not parties to the policy upon which this action is brought. The money which will reimburse the plaintiff (if he is successful here) will not come from them. Defendant, if required to pay plaintiff, will be subrogated to any rights plaintiff has against the third party. The liability of the third party will be unaffected by the outcome of this case and no public policy will be offended because he will receive no protection from the consequences of his unlawful act. Certainly, there is no reason to consider the matter from the viewpoint of the third party and of his insurer. They are unconcerned and unaffected by the present litigation. The proper points of view are those of plaintiff and defendant.
> * * *

> "The primary purpose of [uninsured motorist] coverage, in the absence of statutory declaration or of a provision of the policy indicating otherwise, is to protect innocent victims who have been injured by financially irresponsible motorists. The purpose of the coverage is not protection from liability. This portion of the policy, therefore, resembles an accident policy for the victim of the uninsured motorist." 264 Or at 550-51.

Although *Davis* concerned Michigan law, its reasoning is equally persuasive under Oregon law. The intent of Oregon's uninsured motorist coverage, like Michigan's, is to protect innocent victims of financially irresponsible motorists. *See General Acc. Fire and Life v. Shasky*, 266 Or 312, 318-19, 512 P2d 987 (1973). To an injured party, a motorist

with ineffective liability insurance is just as financially irresponsible as a motorist with no liability insurance at all. 266 Or at 319 ("The distinction between not having insurance and not having effective insurance is nebulous."). Consequently, for purposes of UM coverage, the question of whether an injury is caused by an accident must be viewed, and resolved, from the insured's perspective.

Given that perspective, defendants' "collateral estoppel" argument fails. Issue preclusion requires that the issue decided in the prior adjudication be identical to the one presented in the subsequent adjudication. *State Farm Fire & Cas. v. Reuter*, 299 Or 155, 158, 700 P2d 236. In *North Pacific Ins. Co. v. Vincent and Nissan Corp., supra*, the court focused on *Vincent's* fraudulent intent and conduct in determining that the Seven Devils wreck was not an "accident" for purposes of Vincent's liability coverage. Thus, because Fox's participation was neither expressly nor implicitly adjudicated, issue preclusion does not apply.

The inquiry thus reduces to whether, viewed from Fox's perspective, the Seven Devils wreck was an "accident." Our disposition of that issue turns on the resolution of two subsidiary issues. First, what is the definition of "accident" for UM purposes? Second, applying that definition, were there disputed issues of material fact concerning Fox's intent to participate in the wreck, which should have precluded summary judgment?

Defendants contend that an injury-producing event is not an "accident" under a UM policy if the insured intended to participate in that act. As support for that proposition, defendants rely on *St. Paul Fire v. McCormick & Baxter Creosoting*, 126 Or App 689, 870 P2d 260, *mod* 128 Or App 234, 875 P2d 537 (1994), which cited the following rule:

> "Where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen." 126 Or App at 705

Applying that test, defendants argue that, because Fox intended to ride in the truck when Vincent drove it off the road, his death was not the result of an accident.

Plaintiff contends that the appropriate test is not whether the UM insured intended to participate in the act, but whether the injury was intended. Plaintiff relies on cases construing exclusions for intentionally caused injuries in liability insurance policies.[7] Those cases hold that such exclusions apply only where the insured tortfeasor intended to injure the victim:

> "It is not sufficient that the insured's intentional, albeit unlawful, acts have resulted in unintended harm; the acts must have been committed for the purpose of inflicting the injury and harm before either a policy provision excluding intentional harm applies or the public policy against insurability attaches." *Allstate Ins. Co. v. Stone, supra* n 7, 319 Or at 278.

Thus, plaintiff argues that Fox's death was caused by an accident, because there is no evidence that Vincent intended to injure Fox.

Neither plaintiff nor defendant cite the correct test for "accident." Plaintiff's reliance on the "intended injury" test is misplaced because that test improperly views the event from Vincent's, not Fox's perspective. Defendant's test for "accident" is closer to the mark, but not entirely correct. The test cited with approval in *St. Paul Fire v. McCormick & Baxter Creosoting, supra*, makes a distinction between "acts" and "results." However, 16 years earlier, in *Botts v. Hartford Acc. & Indem. Co.*, 284 Or 95, 585 P2d 657 (1978), the court disapproved that distinction and substituted a new methodology:

> "Questions relating to the continued vitality of the means-result distinction need not be resolved in the present case because, as noted, the policy we are construing does not contain an accidental means or cause requirement. However, as seen in the briefs in this case, the distinction keeps rising

---

[7] *See, e.g., Ledford v. Gutoski*, 319 Or 397, 877 P2d 80 (1994); *Allstate Ins. Co. v. Stone*, 319 Or 275, 876 P2d 313 (1994); *A-1 Sandblasting v. Baiden*, 293 Or 17, 643 P2d 1260 (1982); *Nielsen v. St. Paul Companies*, 283 Or 277, 583 P2d 545 (1978); *Isenhart v. General Casualty Co.*, 233 Or 49, 377 P2d 26 (1962).

to the surface and creating unnecessary confusion; consequently, we shall lay the distinction to rest at this seemingly opportune time.

"However, the abolishment of the above-discussed distinction does not end our inquiry, for it is still necessary that we determine whether the death of the decedent was 'accidental.' * * * The insurance company may, of course, insert in its policy any definition of 'accident' it chooses but, in the absence of doing so, it must accept the common understanding of the term by the ordinary member of the purchasing public.

"* * * * *

"In situations in which 'accident' or 'accidental' are not defined in the policy, it is for the court to decide the definition which is properly applicable to the particular factual situation, taking into consideration what we believe to be the popular non-technical understanding of the term. If the evidence discloses that no reasonable jury could find that a view of the facts most favorable to plaintiff is within the definition established by the court, a verdict should be directed by the court for the defendant. If the undisputed facts clearly come within the definition, a judgment should be directed for plaintiff. If the facts are disputed, or if varying legitimate inferences can be drawn from established facts, the question is one for the jury." 284 Or at 100-04.

■■ Because defendants have not defined "accident" in the UM policy, we must formulate the correct definition "taking into consideration what we believe to be the popular non-technical understanding of the term." 284 Or at 103. *Botts*, itself, did not explicitly adopt a definition of "accident" or "accidental." However, in post-*Botts* cases, we have applied a definition implicitly endorsed in *Botts*: An accident is an event that, from the UM insured's perspective, is "unforeseen, unexpected, unintended or the like." *See Botts v. Hartford Acc. & Indem. Co., supra,* 284 Or at 101 n 3; *Albertson's Inc. v. Great Southwest Fire Ins. Co.,* 83 Or App 527, 531, 732 P2d 916, *rev den* 303 Or 332 (1987); *Safeco Ins. v. House,* 80 Or App 89, 96, 721 P2d 862, *rev den* 302 Or 86 (1986).[8] That definition is practical and eminently and

---

[8] The outcomes in *Albertson's, Inc.* and *Safeco Ins. v. House, supra,* turned on the specific language of general liability insurance policies rather than on an insured's intent with respect to uninsured motorist insurance policies. Nonetheless, we find those cases instructive.

"non-technically" sensible. We note, moreover, that it imports, at least in part, a subjective element. Even if an objectively reasonable passenger would not intend or foresee that a car would be driven off a cliff, such an event would still be non-"accidental" for UM coverage purposes if a particular UM insured passenger intended to participate in the event. Thus, we must determine whether genuine issues of fact exist as to whether Fox intended or expected to ride off Seven Devils Road in Vincent's truck.

In their motion for summary judgment, defendants relied on Vincent's deposition to support their assertion that Fox intended to ride along when Vincent intentionally wrecked the truck.[9] Vincent testified:

"A.  We were talking about doing it and up to this point, Billy had never — he always said he was going to be in the truck when I did it but I always was telling him that he was not going to be, that he was going to stand out near the spot where I wanted to go down so I could decide, I could find the spot to go down, and he told me that he wanted to go, that he would feel bad if I went down there and got hurt. He would feel real guilty if one of us got hurt and I told him that I don't know what I [sic] do if he got hurt. * * * Now, that was the only time — that was the only time we kind of second guessed it, feeling we're not doing the right thing, and he said, well, I'm not getting out. I'm going with you all the way. He said if we wear our seat belts, we'll be safe.

"Q.  That was [sic] his words?

"A.  Yeah, and so I said, yeah, I think you're right. We remembered [a] high school assembly where [a] State trooper had told us that he had never pulled a dead body out of a seat belt and so we were confident that none of us would get hurt so we drove up to, to near the wreck, near the spot, stopped about a hundred yards and made sure, you know, like you sure about this, you know, and, yeah, so I went ahead and got up to about 35 miles an hour and went down the spot that we had previously planned on going, going down when we went up Seven Devils Road."

To rebut that evidence, plaintiff relied on the deposition of Ron Hunt, a friend of Vincent and Fox, whom Vincent

---

[9] On appeal, plaintiff contends that Vincent's deposition is hearsay. Because plaintiff failed to raise this issue in the trial court, we decline to address it. *See* ORAP 5.45(2).

had repeatedly asked to participate in his scheme as a lookout. Hunt testified as to a conversation he had with Vincent and Fox on the morning of the day of the fatal wreck:

"Q. And it was your understanding that you would get out of the vehicle, go around the corner and kind of watch to see that other people wouldn't be coming onto the scene?

"A. That's what I thought.

"Q. And that means while Tim would roll the truck over the edge of the cliff but wouldn't go over the cliff with the truck?

"A. Right.

"Q. And Billy was present and he heard that?

"A. Right.

"Q. And it was your understanding from what was being said that Billy was going to be participating as a witness?

"A. That's what it seemed like.

"Q. And that's because of what Billy told you?

"A. Well, that's from being there when Tim was asking me.

"Q. And you asked Billy what are you going to be doing?

"A. I asked him, I mean when Tim was saying he was going to jump out of the truck, I looked at Billy and I said Billy, are you going to jump out of the truck and he said no, I'm going to be waiting around the corner."

Even viewing Hunt's testimony in the light most favorable to plaintiff, giving him the benefit of all reasonable inferences of fact, *Raethke v. Oregon Health Sciences Univ.*, 115 Or App 195, 198, 837 P2d 977 (1992), *rev den* 315 Or 442 (1993), we conclude that no reasonable trier of fact could conclude that Fox did not intend or expect to ride off Seven Devils Road in Vincent's truck. This is so for two reasons. First, Hunt's testimony does not controvert Vincent's. At most, it shows that, earlier on the day of the wreck, Fox and Vincent agreed that Fox would act as a look out. Vincent's testimony explains that Fox later changed his mind. Second, plaintiff has adduced no evidence controverting Vincent's credibility with respect to the quoted testimony. Although Vincent's general credibility is hardly impeccable given that he lied for a year about staging the wreck, plaintiff points to

no plausible motive for him to lie regarding Fox's intent on the night of the wreck.[10] Ultimately, plaintiff's position reduces to the proposition that Vincent, for unknown reasons, intentionally drove his close friend off Seven Devils Road over his protests or without his knowledge. That unsubstantiated proposition was insufficient to controvert Vincent's testimony. Consequently, the court properly entered summary judgment against plaintiff's first claim for a declaration of UM coverage.

Because of our disposition of plaintiff's first assignment of error, his second, which disputes the dismissal of plaintiff's ancillary breach of contract claim, also fails. Plaintiffs remaining assignments of error are without merit and warrant no further discussion.

Affirmed.

---

[10] At the time Vincent gave his deposition testimony, he had already pleaded no contest to criminally negligent homicide, and, thus, did not face the prospect of future criminal liability. Moreover, as plaintiff acknowledged, Vincent was effectively judgment-proof, so he had no pecuniary motive to lie.