Submitted on remand from the Oregon Supreme Court December 16, 1998, argued
on remand January 20, affirmed July 12, 2000

Steve FOX,
Representative of the Estate of
William Daryl Fox, Deceased,
*Appellant,*

*v.*

COUNTRY MUTUAL INSURANCE CO.,
and Northwest Farm Bureau Insurance Company,
*Respondents.*

(92CV1057, 93CV1076; CA A81951 (Control), A83125)
(Cases Consolidated)

7 P3d 677

Margaret H. Leek Leiberan argued the cause and filed the briefs for appellant.

Bernard S. Moore argued the cause and filed the brief for respondents.

Before Haselton, Presiding Judge, and Edmonds and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

These consolidated actions are before us on remand. *Fox v. Country Mutual Ins. Co.*, 327 Or 500, 964 P2d 997 (1998). We affirm.

In August 1990, William Fox was killed in a staged auto accident in Coos County. Plaintiff, the personal representative of Fox's estate, appealed from judgments for defendants Country Mutual Insurance Co. and Northwest Farm Bureau Insurance Co. determining, *inter alia*, that defendants were not obligated to pay benefits to Fox's estate under the uninsured and underinsured (UM) coverage in Fox's automobile insurance policy. In our original opinion, we affirmed the trial court's summary judgment for defendants based on our conclusion that the incident that killed Fox was not "caused by an accident" within the meaning of defendants' policy. *Fox v. Country Mutual Ins. Co.*, 132 Or App 336, 888 P2d 111 (1995), *rev'd and rem'd* 327 Or 500, 964 P2d 997 (1998). The Supreme Court reversed on that issue and remanded to us to consider defendants' alternative arguments for affirming summary judgment, as well as plaintiff's other assignments of error. On remand, we conclude that the trial court properly granted summary judgment for defendants on plaintiff's claim for declaratory relief, because the vehicle in which Fox was killed was neither uninsured nor underinsured. Additionally, as explained below, we conclude that the trial court did not err in dismissing plaintiff's claims for breach of contract and intentional interference with an economic relationship. Accordingly, we affirm.

We recounted the material facts and procedural history in our previous opinion:

"During the summer of 1990, Tim Vincent, one of Fox's close friends and a high school classmate, decided to intentionally wreck his Nissan pickup so that he could collect the insurance proceeds and purchase a Toyota pickup. Fox and Vincent discussed Vincent's plans, and Fox agreed to participate, initially, as a look-out for oncoming traffic. On the night of August 27, 1990, Vincent, with Fox as a passenger, not a look-out, intentionally drove his Nissan off Seven Devils Road near Bandon. Vincent survived the wreck, but Fox did not.

"At the time of the wreck, Vincent was a named insured under a $500,000 automobile liability policy from North Pacific Insurance Co. Fox was a named insured under his family's UM coverage, which defendants issued with a limit of $500,000.

"For more than a year following the wreck, Vincent falsely maintained that he accidentally drove off the road because he was blinded by the headlights of a 'phantom' oncoming car as he came around a sharp curve. However, in December 1991, Vincent finally confessed to intentionally causing the wreck to collect insurance proceeds and subsequently pleaded no contest to criminally negligent homicide.

"In January 1992, plaintiff sued Vincent for wrongful death. Because plaintiff feared that Vincent's insurer, North Pacific, might deny coverage, based on Vincent's intentional and fraudulent conduct, he contacted defendants' agent, Jack Waters, to ask about his family's UM coverage at the time of the wreck. Waters erroneously told plaintiff that the policy limit was $100,000, not $500,000.

"In April 1992, North Pacific filed an action against Vincent [and plaintiff, the personal representative of Fox's estate], seeking a declaration that it had no duty to defend or indemnify [Vincent] because of his intentional and fraudulent conduct. Despite the pendency of that action, North Pacific and plaintiff began negotiating a settlement of the wrongful death action. In June 1992, plaintiff wrote to defendants, giving them notice of North Pacific's declaratory judgment action, advising them of a potential settlement with North Pacific, and demanding arbitration to determine coverage under the UM policy. Defendants did not reply. Thereafter, and without receiving defendants' consent,[2] plaintiff accepted $150,000 from North Pacific in settlement of the wrongful death action against Vincent. In July 1992, North Pacific dismissed without prejudice its declaratory judgment action.

"In August 1992, plaintiff brought a product liability suit against Nissan, alleging that the truck had a defective seat belt system. Nissan, in turn, impleaded Vincent causing North Pacific to revive its declaratory judgment action. On August 13, 1993, the court entered a judgment declaring Vincent's liability policy void because of his intentional and fraudulent conduct. *North Pacific Ins. Co. v. Vincent and*

*Nissan Corp.*, Coos County Circuit Court Case No. 92CV-1026. That judgment was never appealed.

"In November 1992, while North Pacific's revived action was pending, defendants informed plaintiff that the UM policy limit at the time of Fox's death was $500,000, not $100,000. Plaintiff then sued defendants, seeking a declaration of coverage under the UM policy and asserting further claims of breach of contract for nonpayment of UM benefits, and intentional interference with plaintiff's settlement with North Pacific.[3] The trial court dismissed the breach of contract and intentional interference claims under ORCP 21 A(8) and entered summary judgment against plaintiff on the declaratory judgment claim. Plaintiff then moved to set the judgment aside so that he could amend his complaint to allege fraud. When the court denied that motion, plaintiff filed a second action against defendants alleging fraud. The court dismissed that action as barred by *res judicata*.

---

"[2] Plaintiff's policy provides:

" 'We do not provide coverage * * * for bodily injury sustained by anyone * * * if, without our consent, the bodily injury or death claim is settled or is resolved by a judgment in a court of law.'

"[3] The gravamen of plaintiff's tortious interference claim was that, by misrepresenting the amount of the UM coverage, defendants caused plaintiff to settle for an amount less than plaintiff would have, had plaintiff known the true limits of his own UM coverage." *Fox*, 132 Or App at 338-40.

Plaintiff then appealed the judgments in both of his actions against defendants, and those appeals were consolidated for our review.[1] In our original opinion, we addressed only plaintiff's first assignment of error, which asserted that the trial court erred in entering summary judgment against plaintiff's claim for declaratory relief. Defendants responded that the trial court's summary judgment for them was correct for the three separate, alternative reasons that they had

---

[1] Plaintiff's supplemental brief on remand, which "totally replaces the prior appellant's brief filed in this case," does not assign error to the trial court's dismissal of his action for fraud. Thus, the propriety of that dismissal is not before us.

offered in support of their motion for summary judgment. We affirmed on defendants' first proffered ground, that Fox's death was not "caused by accident" and, thus, was not within the coverage of the UM policy, and we therefore did not reach the other grounds. *Fox*, 132 Or App at 340. That conclusion, in turn, obviated any consideration of plaintiff's other assignments of error. *Id.* at 348.

On review, the Supreme Court reversed and remanded to us, concluding "that the Court of Appeals erred in sustaining summary judgment for defendants on the theory that Fox's death was not 'caused by accident' under the coverage required by ORS 742.504(1)(a)." *Fox*, 327 Or at 516-17. The court explained that, because "the Court of Appeals did not address plaintiff's other assignments of error and defendants' responsive arguments, * * * we must remand this case * * * for further consideration." *Id.*

On remand, plaintiff raises four assignments of error: (1) The trial court erred in dismissing his breach of contract claim against defendants for nonpayment of benefits under Fox's UM policy. (2) The court erred in dismissing his claim for intentional interference with his alleged "economic relationship" with Vincent's liability insurer, North Pacific. (3) The court erred in granting defendants' motion for summary judgment on plaintiff's request for a declaratory judgment, *i.e.*, in determining that there was no entitlement to UM benefits under the Fox policy. (4) The court erred in denying plaintiff's cross-motion for summary judgment on his request for a declaration of coverage.[2]

Plaintiff's first, third, and fourth assignments of error all ultimately turn on the same legal issue: Was the Vincent vehicle "uninsured" or "underinsured" for purposes of triggering the UM coverage in Fox's insurance policy with defendants? That is so because plaintiff's request for a declaratory judgment on his entitlement to UM coverage and his claim that defendants breached their UM policy agreement

---

[2] *See To v. State Farm Mutual Ins.*, 123 Or App 404, 410, 860 P2d 294 (1993), *aff'd in part, rev'd in part* 319 Or 93, 873 P2d 1072 (1994) (where cross-motions for summary judgment result in the denial of one motion and the granting of another, the denial of a cross-motion for summary judgment may be assigned as error for our review).

by not paying UM benefits are ultimately two sides of the same coin. If the Vincent vehicle was uninsured or underinsured, plaintiff was entitled to declaratory judgment on his entitlement to benefits under the UM policy, and defendants' failure to provide that coverage was a breach of that agreement. Conversely, if the Vincent vehicle was *not* uninsured or underinsured, plaintiff was *not* entitled to a declaration of his entitlement to coverage under the UM policy, and defendants' failure to pay UM benefits was *not* a breach of contract. Given that common, and ultimately dispositive, question, we begin by addressing plaintiff's third assignment of error, which most cogently presents the issue of whether the Vincent vehicle was uninsured or underinsured.

In moving for summary judgment against plaintiff's claim for declaratory relief, defendants argued that the UM policy did not cover claims arising from Fox's death because (1) Fox's death was not "caused by accident"; (2) the Vincent vehicle was neither uninsured nor underinsured; or (3) even if Fox's death were otherwise covered, plaintiff's settlement with Vincent's insurer, North Pacific, without defendants' consent barred recovery under the UM policy. As we explained in our original opinion, the trial court's judgment did not specify its grounds for granting summary judgment. *Fox*, 132 Or App at 340 n 4. Given the Supreme Court's rejection of defendants' first argument, which underlay our original holding, we proceed to address defendants' alternative grounds for affirmance.[3] As explained below, we conclude that, as a matter of law, the Vincent vehicle was neither "uninsured" nor "underinsured" and, on that basis, affirm the entry of summary judgment against plaintiff's claim for declaratory relief.[4]

In seeking declaratory relief, plaintiff asserted that he was entitled to benefits under the UM policy either because the Vincent vehicle was "uninsured" or because,

---

[3] In reviewing whether defendants met the burden of showing that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law, we view the evidence in the record in the light most favorable to plaintiff. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997).

[4] Given that disposition, we do not reach defendants' argument that plaintiff's settlement without defendants' consent bars his recovery under the UM policy.

even if the Vincent vehicle was insured, it was "under-insured." Defendants argue, and we agree, that the Vincent vehicle was neither "uninsured" nor "underinsured." Although "uninsured" and "underinsured" are related terms, *see Wright v. State Farm Mutual Auto. Ins. Co.*, 152 Or App 101, 110-11, 952 P2d 73 (1998), *rev allowed* 328 Or 275 (1999) (explaining relationship of terms), they involve different statutory provisions and are analytically distinct. Accordingly, we address each issue in turn, beginning with whether the Vincent vehicle was "uninsured."

"Uninsured motorist coverage" (UM) is

"coverage * * * insuring the insured, the heirs or legal representative of the insured for all sums which the insured or they shall be legally entitled to recover as damages for bodily injury or death caused by accident and arising out of the ownership, maintenance or use of an uninsured motor vehicle." ORS 742.500(1).

Because ORS 742.504 requires all auto insurance liability policies to provide UM coverage that "in each instance is no less favorable in any respect to the insured or the beneficiary" than if the statutory coverage provision were reproduced in the policy, the terms of defendants' UM policy are dictated by statute. *See Fox*, 327 Or at 506.

ORS 742.504(2)(d)(A) defines "uninsured vehicle" as a vehicle for which there is "no collectible automobile bodily injury insurance" *or* a vehicle for which there was a liability policy in place at the time of the accident, but the insurer "denies coverage thereunder."[5] In support of their motion for summary judgment, defendants argued that the Vincent vehicle, in which Fox was killed, was not "uninsured" because, on the date of the accident, the Vincent vehicle had

---

[5] ORS 742.504(2)(d) provides, in part:

"Uninsured vehicle,' except as provided in paragraph (e) of this provision, means:

"(A) A vehicle with respect to the ownership, maintenance or use of which there is no collectible automobile bodily injury liability insurance or bond, in at least the amounts prescribed for bodily injury or death under ORS 806.070 * * * or with respect to which there is such collectible bodily injury liability insurance or bond applicable at the time of the accident but the insurance company writing the same denies coverage thereunder or, within two years of the date of the accident, such company is * * * declared bankrupt."

an applicable liability policy with a limit of $500,000. Therefore, defendants argued, plaintiff was not entitled to benefits under Fox's UM policy, and they were entitled to summary judgment as a matter of law.

Plaintiff argues that the trial court erred in granting summary judgment because, even though there was an applicable liability policy at the time of the accident, North Pacific subsequently denied coverage, thereby rendering the Vincent vehicle "uninsured" within the meaning of ORS 742.504(2)(d)(A). Specifically, plaintiff argues that North Pacific "denied" coverage within the meaning of ORS 742.504(2)(d)(A) in April 1992, when it filed the declaratory judgment action against Vincent and plaintiff asserting that its policy with Vincent was void due to Vincent's fraudulent and intentional acts. *See* 169 Or App at 56-58 (quoting *Fox*, 132 Or App at 338-40) (procedural history). Plaintiff contends that "there would have been no reason for North Pacific to file the declaratory judgment proceeding if it were not denying coverage, [because] an insurance company which accepts coverage merely pays the claim." According to plaintiff, "under any reasonable interpretation of the facts, North Pacific denied coverage for this accident."

Defendants respond to plaintiff's "denial" argument by asserting that North Pacific's filing of a declaratory judgment action against plaintiff was not a "denial" but simply an acknowledgment that a controversy existed. Defendants highlight that North Pacific did, in fact, hire defense counsel for Vincent, enter into settlement negotiations with plaintiff on Vincent's behalf, and ultimately settle plaintiff's wrongful death claim for $150,000. Thereafter, North Pacific dismissed its declaratory judgment action against Vincent and plaintiff. Defendants argue that, in light of North Pacific's ultimate settlement of plaintiff's claim, North Pacific did not deny coverage and the Vincent vehicle was therefore not "uninsured." We agree.

Jurisdictions that have considered this question have uniformly concluded that

> "[u]nder an uninsured motorist policy defining an 'uninsured motor vehicle' to include a vehicle for which the potential insurer denies coverage, the insured's acceptance

of a settlement offer from the tortfeasor's liability carrier precludes recovery of uninsured motorist benefits, notwithstanding the liability carrier's continued denial of coverage." Lee R. Russ, 9 *Couch on Insurance 3d*, § 123:41 (3d ed 1997).

For example, in *Rister v. State Farm Mut. Auto. Ins. Co.*, 668 SW2d 132 (Mo App 1984), the Missouri Court of Appeals considered whether a liability insurer "denied" coverage for purposes of a UM policy when it initially denied coverage but subsequently extended a settlement offer that the plaintiffs accepted. The court concluded that the vehicle was not uninsured:

> "A legal right to recover under the uninsured motor vehicle insurance and a legal right to recover against the liability carrier cannot coexist. They are mutually exclusive.
>
> "The purpose of the [UM] statute is to give uninsured motor vehicle insureds coverage parallel to that they would have had if the accident had been caused by a vehicle that had the required liability coverage. It is not the purpose of the statute to require dual coverage.
>
> ° "\* \* \* \* \*
>
> "When a liability insurer, after an initial denial of coverage, extends an offer in settlement, it may be said it has only conditionally withdrawn its denial. However, when such an offer is accepted, the liability insurer no longer denies coverage. In this case, when the $35,000 was offered and accepted, American Casualty no longer denied liability coverage. It paid $35,000 by reason of that coverage. The plaintiffs were not entitled to recover upon the uninsured motor vehicle insurance in the State Farm policies." *Rister*, 668 SW2d at 136-37 (citations omitted).

*See also Jones v. Sentry Ins. Co.*, 462 NW2d 90, 91-92 (Minn Ct App 1990) (despite liability insurer's continued denial of coverage, UM insurer was no longer potentially liable after UM insured accepted a settlement from liability insurer: "This result is consistent with the purpose of uninsured motorist coverage, to give the victim injured by an uninsured motorist coverage which a victim would potentially receive if an insured motorist caused the accident.").

We find the reasoning in *Rister* and *Jones* persuasive. It is well-established that the basic purpose of UM coverage in Oregon is "to protect [the] policy holder against risk of inadequate compensation for injuries caused by [a] financially irresponsible tortfeasor, *i.e.*, to place [the] policy holder in [the] same position as if [the] tortfeasor had liability insurance." *Mutual of Enumclaw Ins. Co. v. Key,* 131 Or App 130, 134, 883 P2d 875 (1994), *rev den* 320 Or 567 (1995) (citing *Peterson v. State Farm Ins. Co.*, 238 Or 106, 111-12, 393 P2d 651 (1964)). Given that, we conclude that, regardless of whether North Pacific's filing of a declaratory judgment action against plaintiff constituted an initial denial of coverage, its subsequent offer of settlement and ultimate payment of $150,000 to plaintiff cannot be characterized as a "denial of coverage" within the meaning of ORS 742.504(2)(d)(A). Thus, North Pacific's filing of the declaratory judgment action did not render the Vincent vehicle "uninsured."

Plaintiff also argues that the Vincent vehicle was "uninsured" within the meaning of the statute because, by failing to intervene or otherwise challenge the Coos County Circuit Court's judgment in the second declaratory judgment action between North Pacific and Vincent (which held that there was no coverage under the policy because Vincent's conduct was "intentional"), *see* 169 Or App at 57-58 (quoting *Fox*, 132 Or App at 338-40), defendants waived any argument that they did not deny coverage. Put another way, plaintiff argues that defendants are bound by the Coos County court's unappealed determination that the accident was not covered by Vincent's liability policy with North Pacific, even though defendants were not parties to that action and even though that holding is wrong in light of the Supreme Court's subsequent holding in *Fox*.

That argument fails. The Coos County judgment was entered pursuant to the Uniform Declaratory Judgments Act, ORS chapter 28, which provides that "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." ORS 28.110. Defendants were not parties to that judgment and, consequently, cannot be bound by its holding, regardless

of the fact that they did not ask to be joined or otherwise challenge the propriety of the judgment. *See Nolan v. Jackson National Life Ins. Co.*, 155 Or App 420, 430, 963 P2d 162 (1998), *rev den* 328 Or 275 (1999) ("That requirement [ORS 28.110] has been held to be jurisdictional; failure to join an interested party renders any judgment void.")[6] Consequently, the Coos County judgment has no preclusive effect *vis-à-vis* defendants. In sum, the Vincent vehicle was not "uninsured."

We turn then to plaintiff's alternative argument that the Vincent vehicle was "underinsured." ORS 742.502(2)(a) provides, in part:

> "Uninsured motorist coverage larger than the amounts required by ORS 806.070 shall include underinsurance coverage for damages or death caused by accident and arising out of the ownership, maintenance or use of a motor vehicle that is insured for an amount that is less than the insured's uninsured motorist coverage. *Underinsurance benefits shall be equal to uninsured motorist coverage benefits less the amount recovered from other automobile liability insurance policies.*" (Emphasis added.)

Plaintiff asserts that, under ORS 742.502(2)(a), he is "entitled to underinsurance benefits of $350,000 ($500,000 minus $150,000)" because Fox's UM limits with defendants were $500,000 and he recovered only $150,000 in his settlement with North Pacific. According to plaintiff, the emphasized language in the statute and *Vega v. Farmers Ins. Co.*, 323 Or 291, 918 P2d 95 (1996), together stand for the proposition that a vehicle is "underinsured" within the meaning of the statute if the sums actually paid to the injured party by the liability insurer are less than the injured party's UM policy limit.

Defendants respond that, because both Vincent's liability policy with North Pacific and Fox's UM policy with defendants had policy limits of $500,000, the Vincent vehicle was not "underinsured" within the meaning of the statute.

---

[6] We note, moreover, that, in light of the Supreme Court's holding in *Fox*, the Coos County court's determination—that the wreck that killed Fox was not an accident for purposes of Vincent's North Pacific liability policy—is wrong as a matter of law.

Relying on *Lunsford v. Farmers Ins. Co.*, 118 Or App 308, 846 P2d 1206, *rev den* 317 Or 162 (1993), defendants assert that the first quoted sentence of ORS 742.502(2)(a) provides that a vehicle is underinsured *only* if the injured party carries higher amounts of UM coverage than the tortfeasor's liability coverage. In defendants' view, the second quoted sentence of ORS 742.502(2)(a) ("[u]nderinsurance benefits shall be equal to uninsured motorist coverage benefits less the amount recovered from other automobile liability insurance policies") only comes into play to calculate the *amount* of underinsurance liability owed when a vehicle meets the definition of "underinsured." We agree with defendants.

*Lunsford* is dispositive. There, the plaintiff, who had $50,000 in UM coverage, was injured in an accident caused by Peterson, whose liability insurance had a $50,000 per accident limit. The plaintiff obtained a judgment against Peterson *for* $25,000 but received only $17,500 because there were multiple claims against his policy. The plaintiff then sued the defendant, her own insurer, for $7,500 in underinsurance benefits. The trial court granted summary judgment for the defendant and we affirmed:

> "The sole issue is whether *former* ORS 743.789(2) (renumbered ORS 742.502(2)), requires defendant to pay 'underinsurance coverage' on plaintiff's claim. It does not. *Under the statute, defendant is required to provide underinsurance coverage only if plaintiff's coverage exceeded Peterson's liability coverage at the time of the accident.* Plaintiff acknowledges that her coverage limits were identical to Peterson's." *Lunsford*, 118 Or App at 309 (emphasis added; footnote omitted).

Thus, our determination that Peterson's vehicle was not "underinsured" turned on a comparison of his liability policy limits with the plaintiff's UM policy limits, not on whether the amount the plaintiff actually recovered from the liability insurer was less than her UM policy limits. Indeed, had the focus of our determination been the latter, we would have reached the opposite result, because the plaintiff actually recovered only $17,500 and her UM policy limit was $50,000.

Here, the parties agree that Vincent's liability policy limit and Fox's UM policy limit are identical: $500,000. Thus,

applying *Lunsford*, we conclude that the Vincent vehicle was not "underinsured" within the meaning of ORS 742.502(2)(a).

*Vega*, which plaintiff invokes, is not to the contrary. Indeed, nothing in *Vega* supports plaintiff's assertion that under ORS 742.502, "the insurer's liability is reduced only by any sums actually paid to the insured from another source."

In *Vega*, the plaintiffs were injured in an accident caused by Galluci. 323 Or at 293. Galluci had liability insurance with policy limits of $50,000 per person and $100,000 per accident. The plaintiffs' UM policy limits were $100,000 per person and $300,000 per accident. The plaintiffs sued Galluci for negligence, but Galluci died while that action was pending. The plaintiffs never amended their complaint to name the personal representative of Galluci's estate as a defendant, and the trial court consequently dismissed their complaint with prejudice. Thereafter, the plaintiffs filed a claim for underinsurance benefits against their UM insurer. The trial court granted summary judgment for the plaintiffs. The defendant appealed, arguing that the plaintiffs were precluded from recovering under their UM policy because they has failed to "exhaust" the limits of the tortfeasor's liability, as required by a provision in their UM policy. *Id.* at 294. Thus, the question in *Vega* was whether the "exhaustion" requirement in the plaintiffs' UM policy was unenforceable because it was "less favorable" to the insured than "if the [statutory provisions] were set forth in the policy." We affirmed the trial court's entry of summary judgment for the plaintiffs. *Id.*

On review, the Supreme Court affirmed, concluding that the UM policy's "exhaustion" clause could not bar the plaintiffs from recovering UM benefits because it was "less favorable" to insureds than the statutes, under which the *only* basis for reducing the amount of UM benefits paid on an accident involving an "underinsured" vehicle was that found in ORS 742.504(2):

"The policy term authorizes the wholesale denial of coverage unless the limit of a tortfeasor's liability insurance has been exhausted. ORS 742.504(7)(c)(A) only requires that the insurer's insurance liability be reduced by any sums *actually paid* to the insured from another source.

"Consequently, the exhaustion provision violates the 'no less favorable' requirement at ORS 742.504." *Vega*, 327 Or at 302 (emphasis in original).

Thus, the only issue in *Vega* was whether the plaintiffs' failure to recover from Galluci's liability insurer could bar them from receiving underinsurance benefits to which they were otherwise entitled. The Supreme Court's observation on which plaintiff relies refers only to the *amount* of available benefits and not to the qualitatively distinct threshold issue of *entitlement* to coverage. Consequently, *Vega* is inapposite, and we adhere to *Lunsford*: Because Vincent's liability policy and Fox's UM policy had the same limits, the Vincent vehicle was not "underinsured."

We thus conclude that the Vincent vehicle was neither "uninsured" nor "underinsured." Accordingly, we affirm the trial court's allowance of summary judgment against plaintiff's claim for declaratory relief. We similarly, and necessarily, affirm the trial court's dismissal of plaintiff's claim for breach of contract and its denial of plaintiff's cross-motion for summary judgment on the declaratory relief claim.

We turn finally to plaintiff's second assignment of error, which asserts that the trial court erred in dismissing plaintiff's claim for intentional interference with an advantageous economic relationship. Count Three of the complaint alleged:

"25.

"Defendants' conduct of failing to disclose the $500,000 coverage for uninsured and underinsured motorist protection for William Daryl Fox was conduct which prevented Plaintiff from realizing the full value of his wrongful death claim against Vincent in the following particulars:

"(a)   Defendants knew Plaintiff herein would settle for any amounts over $100,000, the amount of uninsured/ underinsured coverage Plaintiff was led to believe was provided by Defendants' policies herein.

"(b)   Defendants knew that any settlement without their consent would absolve Defendants from their obligation to provide any uninsured/underinsured coverage benefits to plaintiff herein.

"26.

"Defendants' interference with the economic advantages and relations contained in the lawsuit of Fox v. Vincent is wrongful beyond the fact of the interference itself in the following particulars:

"(a)   Withholding material information from the Personal Representative of the Estate of William Daryl Fox for the improper motive of avoiding their contractual obligations to the estate of William Daryl Fox;

"(b)   Seeking to avoid their obligations to consent or not consent to the settlement by remaining silent;

"(c)   Having negligently misrepresented policy limits of $100,000 to the Personal Representative of William Daryl Fox, and thereafter having knowledge that the Personal Representative was making settlement decisions based on erroneous information, remaining silent;

"(d)   Intentionally misrepresenting the coverage limits available to the representative of [William] Daryl Fox."

Plaintiff alleged $1,204,000 in actual damages and $500,000 in punitive damages as a result of defendants' intentional interference with his economic relations.

Defendants moved to dismiss that claim as failing to state ultimate facts sufficient to constitute a claim. ORCP 21 A(8). The trial court granted that motion without explanation. In reviewing dismissal of a claim pursuant to ORCP 21 A(8), we accept as true all well-pleaded allegations in the complaint and give plaintiff the benefit of all favorable inferences that may be drawn from the facts alleged. *Granewich v. Harding*, 329 Or 47, 51, 985 P2d 788 (1999).

To state a claim for intentional interference with economic relations,[7] a plaintiff must allege:

"(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage); (2) intentional interference with that

---

[7] The Supreme Court refers to this tort as both "intentional interference with economic relations," *see, e.g., McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995), and, where applicable, "intentional interference with prospective economic advantage," *see, e.g., Allen v. Hall*, 328 Or 276, 281, 974 P2d 199 (1999).

relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages." *Allen v. Hall*, 328 Or 276, 281, 974 P2d 199 (1999).

Assuming, without deciding, that plaintiff's complaint was otherwise sufficient, we conclude that plaintiff did not allege the existence of a protected "business relationship" or "prospective economic advantage" for purposes of the tort of intentional interference with economic relations.

Before focusing on whether the relationship plaintiff alleged is protected by the tort of intentional interference with economic relations, we must first define the exact nature of the alleged relationship. In that regard, it is helpful to review the events surrounding the alleged "interference" by defendants, as described in plaintiff's complaint. Plaintiff, the personal representative of Fox's estate, was litigating a wrongful death claim against Vincent, the driver of the truck in which Fox was killed. Vincent's insurer, North Pacific, was representing Vincent in that litigation. North Pacific had also initiated a declaratory judgment action against both Vincent and plaintiff, alleging, *inter alia*, that its policy with Vincent was void due to Vincent's fraudulent and intentional acts. Plaintiff had not yet filed a claim against defendants for UM coverage. However, because plaintiff feared that North Pacific might either deny coverage or prevail in its declaratory judgment action, plaintiff contacted defendants to inquire about Fox's UM coverage at the time of the accident. At that time, defendants told plaintiff that Fox's UM policy limit was $100,000, when in fact it was $500,000. Thereafter, plaintiff and North Pacific began negotiating a settlement of the wrongful death claim. Plaintiff advised defendants that he was considering settling with North Pacific for $150,000, but defendants did not reply. Plaintiff then accepted North Pacific's settlement of the wrongful death claim for $150,000.

Thus, the gravamen of plaintiff's intentional interference claim is that defendants, by misrepresenting the amount of Fox's UM coverage, caused plaintiff to settle rather than go to trial against Vincent and North Pacific (or to settle with North Pacific for an amount less than plaintiff

would have obtained had plaintiff known the true limits of the UM coverage). Implicit in that assertion is the notion that, had plaintiff known of the $500,000 limit on Fox's UM policy, he would have approached the North Pacific litigation more aggressively: He would have known that, even if he rejected settlement with North Pacific and ultimately lost the North Pacific litigation because the occurrence was not deemed to be an "accident" within the liability coverage, he could then seek to recover up to $500,000 in UM coverage on the ground that the Vincent vehicle was uninsured.[8] Thus, armed with the knowledge that the UM limits were $500,000, not $100,000, he might have obtained a richer settlement or judgment against North Pacific. Instead, plaintiff contends:

> "Plaintiff, not knowing a $500,000 uninsured motorist policy was in effect to cover the wrongful death of Billy Fox, was faced with an economic decision. Settle for the $150,000 offered by Vincent's carrier prior to a declaration that there was no coverage for Vincent's acts or proceed to trial, obtain a dry judgment against Vincent, and thereafter, collect $100,000 from these Defendants."

With that background in mind, we return to consider the nature of the relationship that was the object of the alleged interference. Plaintiff's complaint, as quoted above, alleges that: "Defendants' interference with *the economic advantages and relations contained in the lawsuit of Fox v. Vincent* is wrongful beyond the fact of the interference itself." (Emphasis added.) Thus, as pleaded, the "economic relationship" with which defendants' conduct allegedly interfered was the *ongoing litigation between plaintiff and North Pacific*, Vincent's insurer.

On appeal, plaintiff's brief characterizes his "economic relationship" with North Pacific as one in which "plaintiff (the estate of the deceased) was the potential third-party beneficiary of a contract for automobile insurance between North Pacific and Vincent." However, as detailed

---

[8] A declaration that Vincent's policy did not cover the incident because Fox's injuries were not accidental from Vincent's perspective would not preclude plaintiff from recovering under his UM policy. With respect to Fox's UM policy, the "accident" inquiry would be whether the insured, *i.e., Fox*, "intended or expected to cause an injury to himself of the kind that occurred." *Fox*, 327 Or at 516.

above, plaintiff's complaint does not allege interference with any contractual relationship, much less a third-party beneficiary relationship arising from the liability policy. Rather, the object of the alleged interference is explicitly described as "the economic advantages and relations contained in the lawsuit of *Fox v. Vincent*." In reviewing a dismissal for failure to state a claim, we limit our review to the "face of the complaint." *Chaney v. Shell Oil Co.*, 111 Or App 556, 567, 827 P2d 196, *rev den* 313 Or 299 (1992). Accordingly, the question before us is limited to whether the economic relationship alleged in plaintiff's complaint, *viz.*, "the economic advantages and relations contained in the lawsuit of *Fox v. Vincent*," is a business relationship or expectancy for purposes of the tort of intentional interference with economic relations. We conclude that it is not.

Under Oregon law, a party may recover damages for wrongful interference with a contract. *Wampler v. Palmerton*, 250 Or 65, 439 P2d 601 (1968). The interest protected by the tort is "the interest of the individual in the security and integrity of the contractual relations into which he has entered. Economic relations are controlled by contract and the public also has an interest in maintaining the security of such transactions." *Wampler*, 250 Or at 73. Moreover, in appropriate circumstances, a third-party's interference may be actionable "even though the arrangement interfered with does not rise to the dignity of a contract." *Luisi v. Bank of Commerce*, 252 Or 271, 275, 449 P2d 441 (1969); *see, e.g., Aylett v. Universal Frozen Foods Co.*, 124 Or App 146, 861 P2d 375 (1993) (potato growers could bring action for intentional interference with their relationship with a prospective buyer). *See also McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995) (describing the tort of intentional interference with economic relations as protecting a "prospective economic advantage").

Most recently, in *Allen*, the Oregon Supreme Court held that "an intentional interference with a prospective inheritance may be actionable under a reasonable extension of the well-established tort known as intentional interference with economic relations." 328 Or at 280. In *Allen*, the plaintiff s alleged that, but for the defendants' interference, they would have inherited certain property from the estate of

George Putman. The plaintiffs were not named beneficiaries of Putman's will, but they alleged facts that demonstrated that they almost certainly would have been were it not for the defendants' interference.[9] On certification from the Ninth Circuit, the Supreme Court held that the plaintiffs had stated a claim for intentional interference with economic relations, reasoning:

"Although, heretofore, this court has applied [the tort of intentional interference with economic relations] only to contractual and business relationships and prospects, we are persuaded that the tort also may, by a reasonable and principled extension, be made applicable to some *noncommercial* relationships and prospects, such as the one alleged by plaintiffs in the present case.

"[B]efore we attempt to relate the allegations in the present complaint to the elements of [the tort of intentional interference with economic relations], we must explain why the tort may, by a reasonable and principled extension, be made applicable to a prospective inheritance—typically a noncommercial expectancy.

"The answer lies in the very close analogy that exists between an expectancy of inheritance and those other interests to which this court has already extended the protections of the tort of intentional interference with prospective economic advantage. Although an expectancy of inheritance is, by definition, purely prospective, so are many of the commercial interests that have been associated with and are protected by the tort. *See McGanty*, 321 Or at 535 (noting that tort protects prospective economic advantage in addition to existing contracts and business relationships). Moreover, prospects of inheritance long have been recognized as interests that are worthy of common-law protection. Ultimately, an expectancy of inheritance is an interest that fits by logical extension within the concept

---

[9] Specifically, the plaintiffs alleged that in the months before his death, Putman drafted a will devising most of his property to the defendants, on whom he depended on for assistance with his health and finances. Shortly thereafter, Putman met with an attorney to draft and execute a new will leaving some real estate to the plaintiffs. However, before Putman was able to execute the new will, the defendants learned of his efforts to change his will. They immediately placed him in a hospital and prevented him from communicating with his attorney to execute the new will before he died. *Allen*, 328 Or at 278-80.

underlying the tort of intentional interference with prospective advantage and, absent some legitimate reason for excluding it, may be deemed to be covered by the theory of recovery." 328 Or at 280-81 (emphasis in original; citations omitted).

Thus, the court has recognized that the tort of intentional interference with economic relations may be "made applicable to some *noncommercial* relationships and prospects." *Id.* at 281 (emphasis in original). Nevertheless, it is a question of first impression whether a civil lawsuit constitutes the kind of noncommercial relationship and prospective economic advantage protected by the tort of intentional interference with economic relations.

We recognize at the outset that a civil lawsuit represents a prospective economic advantage. In any civil action for damages, the plaintiff's claim represents an expectancy in a monetary recovery that is the object of the litigation. And, as the Supreme Court noted in *Allen*, many of the commercial interests that have been associated with, and are protected by, the tort of intentional interference with economic relations are purely prospective in nature. 328 Or at 281. Indeed, at least with respect to the nature of the economic advantage at issue, an expectancy in a settlement or judgment in a civil lawsuit is no different from an expectancy in an inheritance or a prospective commercial arrangement.

Notwithstanding that similarity, there are material distinctions between a civil lawsuit and other relationships and interests to which the Supreme Court has extended the protections of the tort of intentional interference with prospective economic advantage. Because of those dissimilarities, we decline to extend the tort into this context:

*First,* the essential purpose of the tort is to protect the integrity of, and expectancies in, voluntarily created economic relationships. Conversely, a civil lawsuit is an involuntary relationship that is adversarial in nature. In its earliest and most basic form, the purpose of the tort was to protect "the interest of the individual in the security and integrity of the contractual relations in which he has entered." *Wampler*, 250 Or at 73 (discussing evolution of tort

from ancient Roman law). As courts expanded the tort to protect prospective relations, it encompassed "any prospective contractual relations * * * which would be of pecuniary value to the plaintiff," *see Restatement (Second) of Torts* § 766B comment c (1974), and which were uniformly voluntary in nature. *See id.* ("Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts [including] a continuing business or other customary relationship not amounting to a formal contract."). Thereafter, courts began to recognize "intentional interference with inheritance or gift," considering it as an "extension of the principle found in liability for intentional interference with prospective contracts." *Restatement (Second) of Torts* § 774B comment a (1974).

Thus, while courts have expanded the tort to protect additional types of relationships, its purpose has been constant: To protect the integrity of voluntary economic relationships, both commercial and noncommercial, that would have very likely resulted in a pecuniary benefit to the plaintiff but for the defendant's interference. We further observe that the relationships protected by the tort are, by virtue of their "voluntariness," the products of the parties' free and voluntary actions as autonomous individuals. Thus, in the abstract, the tort serves the essential purpose of protecting the basic right of the individual to conduct his or her economic affairs autonomously, *viz.*, without interference.

Protection of a prospective interest in the outcome of civil litigation does not comport with that essential purpose. A lawsuit is, by its nature, an involuntary relationship. In fact, the only basis for the relationship between opposing parties in a lawsuit is a dispute. The integrity of an actual or putative mutually voluntary relationship is not implicated.

*Second*, courts have not historically afforded prospective interests in the outcome of civil litigation the same level of common-law protection extended to prospective contracts or prospective inheritances. *Cf. Allen*, 328 Or at 281 ("Prospects of inheritance long have been recognized as interests that are worthy of common-law protection."). Although

interests in litigation are certainly afforded some common-law protection, *e.g.*, legal malpractice, we have found no reported decision from any jurisdiction in which a court has extended the tort of intentional interference with a prospective economic advantage to protect civil litigation. *Cf. Blank v. Kirwan*, 39 Cal 3d 311, 216 Cal Rptr 718, 703 P2d 58, 70 (1985) (a person's expectancy in the outcome of a government licensing proceeding is not protected against outside interference because the tort of intentional interference with economic relations has not traditionally protected whatever expectancies may be involved in the governmental licensing process).[10]

*Allen* represents our Supreme Court's furthest extension of the tort of intentional interference with prospective economic advantage. Unlike in *Allen*, the relationship and resulting prospective interest here was not voluntary and, thus, the alleged interference did not implicate the tort's essential purpose. Unlike in *Allen*, where other courts had traditionally and consistently protected expectancies in inheritance, no reported decision has extended the tort to apply in this context. Given those distinctions, we decline to go further.

In so concluding, we emphasize the precise and limited nature of our holding. We decide only that plaintiff failed to state a claim for intentional interference with prospective economic advantage. That holding is based on the peculiar character and requisites of that tort. We do not address, much less purport to preclude, the availability of other tort causes of action, including fraud, in analogous circumstances.

---

[10] Some jurisdictions have recognized a separate tort based on spoliation of evidence, *see, e.g., Hazen v. Municipality of Anchorage*, 718 P2d 456, 463-64 (Alaska 1986), but none has recognized civil litigation as a relationship protected under the tort of intentional interference with a prospective economic advantage. *See also Temple Community Hospital v. Superior Court*, 20 Cal 4th 464, 84 Cal Rptr 2d 852, 976 P2d 223 (1999) (observing that lower courts erred in considering a cause of action for intentional spoliation of evidence to be analogous to the tort of intentional interference with prospective economic advantage).

The trial court did not err in dismissing plaintiff's claim against defendants for intentional interference with his litigation with North Pacific.

· Affirmed.